[No. A108723. First Dist., Div. One. Apr. 6, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
AARON LYNDALL COOPER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II., III., IV., V., and VI. of the Discussion.

## COUNSEL

James Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SWAGER, J.**—This case has managed to wind its way back to us for the third time as a result of an order of the United States District Court which granted defendant's petition for writ of habeas corpus, followed by a retrial of the action and jury verdict that for a second time found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and kidnapping (§ 207, subd. (a)).[2] Defendant complains in this appeal that the federal district court's decision in the writ of habeas corpus proceeding is binding under principles of collateral estoppel or law of the case, and precludes the murder conviction. He also argues that he was improperly denied his rights to substitute his appointed counsel and to represent himself, the trial court gave prejudicial instructions concerning his custody status and erroneous instructions concerning accomplice testimony, and finally that his murder conviction is not supported by substantial evidence. We conclude that neither collateral estoppel nor law of the case principles apply in the present case, defendant's motions to discharge his appointed attorney and represent himself were properly denied, no prejudicial instructional errors were committed, and the murder conviction is supported by the evidence. We therefore affirm the judgment.

### PROCEDURAL HISTORY

The lengthy, protracted path of the case began with a joint jury trial of defendant Aaron Lyndall Cooper (defendant or Cooper) and his codefendant

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant was found not guilty by the jury of a charge of possession of a firearm by a felon (§ 12021, subd. (a)(1)). After the jury verdict, defendant admitted that he suffered prior violent and serious felony convictions and served prior prison terms as alleged in the information. (§§ 667, subd. (e)(1), 667.5, subd. (b), 1170.12, subd. (c)(1).)

Fredrick Cross, after which Cooper was convicted of the first degree murder of William Highsmith (§ 187), carjacking (§ 215), felon in possession of a firearm (§ 12021), and kidnapping (§ 207). The jury also found that defendant was armed with a firearm in the commission of the murder, carjacking and kidnapping offenses (§ 12022, subd. (a)). In a separate bifurcated proceeding the trial court found that Cooper had served a prison term for prior conviction of a felony (§ 12021) and that he had been convicted of a serious felony (§ 211) which qualified as a prior strike under section 667, subdivision (e)(1). On March 14, 1996, the trial court sentenced Cooper to a total term of 71 years to life. The jury convicted codefendant Cross of first degree murder, carjacking and kidnapping, and found arming enhancements for each offense to be true. At a hearing on April 18, 1996, Cross was sentenced to a total sentence of 32 years to life.

In the first, consolidated appeal of their convictions, Cooper and Cross challenged the admission into evidence portions of an out-of-court statement of Miltonous Kingdom made to Oakland police officers while he was incarcerated in a Mississippi jail. When the prosecution called Kingdom as a witness at trial, he asserted the privilege against self-incrimination. The trial court admitted a redacted transcript of Kingdom's statement, which identified both Cooper and Cross as active participants in the kidnapping and murder of Highsmith, but also tended to inculpate Kingdom himself as an accessory to the crimes.[3] The defendants. claimed that. Kingdom's statement did not fall within the declaration-against-penal-interest exception to the hearsay rule, and that admission of the redacted statement violated their confrontation rights. We affirmed the convictions for kidnapping and first degree murder in an opinion filed on November 9, 1998. We found that the trial court did not abuse its discretion by finding that the statement as redacted was sufficiently trustworthy to be admissible under Evidence Code section 1230.

After the California Supreme Court denied the defendants' petition for review, on October 4, 1999, the United States Supreme Court granted a petition for writ of certiorari, vacated the judgment, and remanded the case to us "for further consideration" of the admissibility of Kingdom's statement in light of Lilly v. Virginia (1999) 527 U.S. 116 [144 L.Ed.2d 117, 119 S.Ct. 1887]. In our second opinion in this case filed on July 6, 2000, we found "two significant differences from the Lilly decision" that provided a

---

[3] In a separate trial Kingdom was subsequently convicted of the first degree murder of Highsmith committed during a kidnapping (§§ 187, subd. (a), 189, 190.2, subd. (a)(17)(B)), and sentenced to state prison for life without the possibility of parole. The judgment against Kingdom was affirmed on appeal. (People v. Kingdom (Sept. 13, 1999, A082911) [nonpub. opn.].)

"measure of reliability" of Kingdom's statement, but nevertheless concluded that the statement was inadmissible under the *Lilly* guidelines, and therefore the trial court erred by admitting it. We proceeded to "examine the record to determine if the error was harmless under the reasonable doubt test of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], which governs federal constitutional error." Upon review of the record, we concluded that the murder conviction of Cross must be reversed, but "that the error was harmless beyond a reasonable doubt in the conviction of defendant Cooper for murder."[4] Our conclusion of harmless error as to Cooper was based upon our examination of the "direct and circumstantial evidence" against him that demonstrated "to us beyond a reasonable doubt that the error did not contribute to the verdict."

The California Supreme Court subsequently denied Cooper's second petition for review, and the United States Supreme Court denied his second petition for writ of certiorari. This court thereafter denied his petition for writ relief.

Cooper then filed an action for writ of habeas corpus in the United States District Court in November of 2002. In a decision filed on April 14, 2004, the district court examined numerous claims of error made by Cooper, but for purposes of this appeal the primary inquiry was again directed at the conceded "Confrontation Clause violation" in the admission of Kingdom's statement, and the prejudice associated with the error. The district court found that the "admission of Kingdom's statement to police had a substantial and injurious effect on the jury's verdict against Cooper," not only "with respect to the murder conviction," but also as "to the kidnapping and carjacking convictions." (*Cooper v. McGrath* (N.D.Cal. 2004) 314 F.Supp.2d 967, 988.) The court observed that "[a]lthough the sufficiency of the evidence is not the standard for determining whether an error resulted in prejudice, [citation], the fact that there was insufficient evidence without the improperly admitted evidence shows how powerfully if affected the jury's verdict of guilt on the murder count." (*Id.* at p. 989.) On the erroneous admission of Kingdom's statement, the district court ruled: "Because the Confrontation Clause violation had a substantial and injurious affect on the jury's verdict and the state court's finding of harmless error was an unreasonable application of clearly established federal law, Cooper is entitled to a retrial on all of the charges against him." (*Id.* at p. 992.)

The district court also resolved the claim of "a due process violation based on the insufficiency of the evidence." (*Cooper v. McGrath, supra,* 314 F.Supp.2d 967, 978.) "In determining the sufficiency of the evidence" to

---

[4] Due to the state of the evidence presented at trial we undertook a "harmless error analysis under *Chapman*" that was "distinct as to each defendant."

support the jury verdict, the court excluded "the improperly admitted statement of Kingdom which should not have been admitted at trial because Cooper was unable to confront him." (*Id.* at p. 998.) The district court then embarked upon a wholesale adverse assessment of the credibility of the witnesses at trial and the inferences drawn by the jury.[5] The court found that a "rational jury could not have" found "proof beyond a reasonable doubt" when the "improperly admitted evidence" was "excluded from the equation." (*Cooper v. McGrath, supra,* 314 F.Supp.2d at p. 998.) Therefore, in addition to the prejudicial "Confrontation Clause violation," the court "determined" that "Cooper's right to due process was violated because there was insufficient evidence to support the murder conviction—a determination which shows that [the Confrontation Clause violation] was not harmless error." (*Id.* at p. 999.) "In such a case," the court declared, "retrial rather than acquittal is the remedy. '[T]he Double Jeopardy Clause allows retrial when a reviewing court determines that a defendant's conviction must be reversed because evidence was erroneously admitted against him, and also concludes that without the inadmissible evidence there was insufficient evidence to support a conviction.' [Citation.] In other words, the Clause 'does not bar retrial after a reversal based on the erroneous admission of evidence if the erroneously admitted evidence supported the conviction.' [Citations.]"[6] (*Cooper v. McGrath, supra,* 314 F.Supp.2d at pp. 998–999.)

The case thus returned to the superior court for retrial as ordered. Cooper's motions to dismiss the murder charge on grounds of double jeopardy,

---

[5] " 'When reviewing convictions for sufficiency of the evidence,' " the district court " 'must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*United States v. Rodriquez* (9th Cir. 2006) 464 F.3d 1072, 1078–1079, italics omitted.) The factual determinations made in the state court must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." (28 U.S.C. § 2254(e)(1); see also *Purkett v. Elem* (1995) 514 U.S. 765 [131 L.Ed.2d 834, 115 S.Ct. 1769]; *Thompson v. Keohane* (1995) 516 U.S. 99, 108–109 [133 L.Ed.2d 383, 116 S.Ct. 457]; *Langford v. Day* (9th Cir. 1997) 110 F.3d 1380, 1388.) In conducting the inquiry, the federal court must remain mindful of "the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review." (*Wright v. West* (1992) 505 U.S. 277, 296 [120 L.Ed.2d 225, 112 S.Ct. 2482] (plur. opn. of Thomas, J.); cf. *Yarborough v. Alvarado* (2004) 541 U.S. 652, 663–664 [158 L.Ed.2d 938, 124 S.Ct. 2140]; *Herrera v. Collins* (1993) 506 U.S. 390, 400 [122 L.Ed.2d 203, 113 S.Ct. 853]; *Engle v. Isaac* (1982) 456 U.S. 107, 128 [71 L.Ed.2d 783, 102 S.Ct. 1558].)

The reviewing court must not only examine the evidence "in the light most favorable to the prosecution," but also accept "all reasonable inferences that may be drawn from this evidence." (*Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262, 1276.)

[6] "The claims concerning the sufficiency of the evidence on the kidnapping and carjacking convictions" were "rejected." (*Cooper v. McGrath, supra,* 314 F.Supp.2d 967, 999.)

collateral estoppel, and law of the case were denied both before and during retrial. Following the presentation of evidence, the jury convicted Cooper of first degree murder and kidnapping. Now, over 10 years after the first trial of this action, we have a third appeal before us.

## STATEMENT OF FACTS

On August 16, 1995, the "very decomposed" body of William Highsmith, known by the nickname "Coco,"[7] was discovered in a wooded area of the Oakland hills near Skyline Reservoir. The "bottom part" of the victim's short-sleeve T-shirt had been torn away. A piece of cloth, apparently from the T-shirt, had been tied around his face and mouth so that it separated his teeth; a cloth gag had also been pushed into his mouth. The victim's jacket had been pulled down in the back and around his wrists to restrict the movement of his arms. His pants and boxer shorts had been pulled down to the level of his thighs. Scissors were found a few feet away from the body on the ground.

An autopsy revealed that the victim had died from "a gunshot wound to the head." The bullet entered through the left cheekbone of the victim, passed through the skull, and lodged between the right side of the skull and the scalp behind the ear. The "extensive fracturing of the skull" suggested a "contact wound," although no gunshot residue or splitting of the skin was detected. Due to the advanced state of decomposition of the body, a forensic pathologist offered the opinion that Highsmith had died "very near the time that he was last seen alive," nearly two weeks before on August 3, 1995, perhaps "the same day."

Witnesses had observed the abduction of Highsmith by three men at the intersection of 12th and Market Streets in Oakland on August 3, 1995. That morning, Zanetta Hodges talked with Highsmith, whom she had known most of her life, in the common area behind her residence in West Oakland. Highsmith told Hodges that he intended to "beat up the person" who had accused him of stealing a car. Highsmith added that he "was going to meet" with people "at the store" to discuss the stolen car accusation.

After speaking with Highsmith, Hodges went to East Oakland with her close friend Juanita "Goodie" Walton to get a food stamp card. As they returned to the area of 12th and Market Streets on their way to pick up "food stamps in West Oakland," Walton saw "people she knew" sitting in a blue

---

[7] We will sometimes refer to the victim William Highsmith as Coco, as was often done during trial.

Oldsmobile Delta 88 parked at the side of the Mingleton Temple church. At Walton's request, Hodges backed up her car and stopped across the street in front of Bottles Liquors to talk to the three men seated in the Oldsmobile: the driver Cross, the front seat passenger Miltonous Kingdom, and the rear seat passenger defendant. Hodges was acquainted with defendant and Cross, but had not met Kingdom before. Hodges testified that defendant was wearing black leather gloves, and Walton noticed black gloves on all three of the occupants of the Oldsmobile. They were also wearing "black hoody" jackets.

Walton walked up to the Oldsmobile and asked the men inside, "what were they doing out here" in West Oakland. Defendant said "they were coming to look for someone who stole their drugs" and car, specifically Highsmith. Hodges heard Cross say, referring to Highsmith, "That nigger stole my car, Goodie." When asked by defendant, "what type of nigger was Coco," Walton replied: "That nigger, Coco, he ain't stealing no car. He the type of nigger, he don't get his shoes dirty. He don't steal cars. He sells cars."

A red Corvette driven by K. K. Parker,[8] with Highsmith in the passenger seat, then pulled up and parked on the street near the driveway of the church behind the Oldsmobile. Defendant said, "All right then," and Walton was told to "get away from the car." Walton returned to Hodges's car, whereupon Hodges drove away as the men in the Oldsmobile left that car and met in the parking lot by the church. As she drove away, in the rearview mirror Hodges observed defendant touch Highsmith "on the shoulder."

Rodney Love was also present at the scene of the abduction.[9] While Love was standing outside the Bottles Liquor store at 12th and Market Streets, a tall Black man about 20 years old—whom he neither knew nor identified—got out of a "blue four door Delta," approached him, and asked if he was "Coco."[10] Love saw a large revolver "pokin' out" of the man's shirt. Love said that he was not Coco, and the man walked back to the blue Oldsmobile, in which two other men were sitting. The occupants of the Oldsmobile wore black "puffy" jackets, and at least two of them wore gloves. Love thought they all had guns. According to Love, soon thereafter K. K. Parker drove up in a red Corvette, with Highsmith in the passenger seat, and parked behind

---

[8] The red Corvette was owned by Parker's girlfriend Tisha Williams, but was often driven by Parker.

[9] At trial, Love testified that he did not have "any memory at all" of the details of the events he witnessed on August 3, 1995. An "hour or two after the event," however, Love gave a statement which was an accurate recitation of his observations. A tape of Love's statement to the police was admitted in evidence at trial and played for the jury, as was a portion of his consistent testimony at the first trial in 1995.

[10] Love was acquainted with Coco.

the Oldsmobile. Love unsuccessfully attempted to "motion" to his friend Highsmith to warn him. Parker and Highsmith got out of the Corvette and began talking to the men from the blue Oldsmobile, one of whom briefly grabbed Parker by the neck but then released him. Parker ran into the liquor store. After Highsmith admitted to the men that he was "Coco," they "pull[ed] the guns out," five or six shots were fired, and they forcibly pushed the victim into the trunk of the blue Oldsmobile. One of the three men from the Oldsmobile got into the red Corvette, then both the Oldsmobile and the Corvette were driven off in the same direction.

An employee at Bottles Liquor store, Musa Hussein, testified that about 4:00 p.m. on August 3, 1995, he saw Highsmith outside the store engaged in an argument or heated conversation with three other men across the street by the church. Highsmith was a regular customer of the liquor store, but the other three men were not known to Hussein and he could not identify them, although he gave descriptions of them to the police. Hussein also noticed two vehicles, an "old American" car and a red Corvette, parked near the men. According to Hussein's statement given to the police immediately after the kidnapping, which was read to the jury, one of the men arguing with Highsmith "had a long gun." Another man opened the trunk of the vehicle, while a third man grabbed Highsmith. Hussein then ran back into the store to call the police, but heard "gunshots" outside. Customers yelled, "they're putting him in the trunk."

Douglas Wright, an investigator for the Alameda County District Attorney's Office, testified that around 4:00 p.m. on August 3, 1995, he was driving on 12th Street, approaching Market, when he heard what he "thought were two gunshots ahead" of him. He then observed a red Corvette parked on the right side of the road facing the same direction Wright was traveling. A man was standing behind the Corvette who was described by Wright as "male Black, about 5' 11" in his mid-20's, 170 to 180 pounds." Wright was unable to identify the man, but testified that he was "consistent" in size and build with defendant. As Wright drove by, the man quickly ran to the driver's side of the Corvette, jumped in, "took off, squealed and accelerated around the corner." Wright "got a partial plate" on the Corvette, YOK953, but the last three numbers were incorrect. Across the street, Wright noticed people "ducking down" behind a parked car as if they were "trying to get out of the way." To his left, in the Bottles Liquor store parking lot, Wright saw an "Arabic looking gentleman" who was staring in the direction of the fleeing Corvette, and a "male Black" who was "hustling into the store." Wright "knew something was wrong," so he asked a man in a car "what had happened." The man, who looked "nervous and scared," said that "there had

been a shooting and a kidnapping." Wright reported the crime through the "District Attorney's channel," and asked "them to call the police."

Raynetta Thomas, the victim's sister, testified that on the afternoon of August 3, 1995, she visited briefly with "Coco" and K. K. Parker at her mother's apartment before they left in a red Corvette about 3:45 or 4:00 p.m. A "few minutes" later she heard that a kidnapping had occurred at 12th and Market.

Oakland Police Officer Michael McArthur received a call of "a shooting" at 12th and Market at 4:08 p.m., and arrived there within two minutes. As Officer McArthur spoke with Musa Hussein, K. K. Parker interrupted and began to "talk over him." Parker "seemed to be eager" to tell Officer McArthur "what had happened." During the conversation, however, Parker's attitude changed; he "decided he didn't want to talk" or "cooperate anymore." Parker refused to sign his statement to the officer, and "started to walk away." Parker was then arrested on outstanding warrants and taken into custody.

After Hodges and Walton procured their food stamps at 4:09 p.m., they returned directly to 12th and Market Streets. Police officers were "all over the place." People on the street were quite agitated and concerned over the abduction of Highsmith, as he was a well-liked figure in the West Oakland neighborhood. After speaking with the police, Hodges and Walton, along with "various people," searched for Highsmith, defendant, Cross and Kingdom for hours without success.

About 7:00 on the night of the abduction of Highsmith, George Archambeau was driving westbound across the San Mateo bridge toward Foster City when he observed a "small, blue car" that was stopped with a red Corvette in front of it. As Archambeau passed the two cars, he noticed an African-American man standing outside the red Corvette, and another in the driver's seat. The man standing outside the Corvette threw an object that appeared to be a "folded over" grocery bag over the bridge into the bay. Archambeau drove on, but the Corvette "came driving by" him "extremely fast" with two occupants in the vehicle, both African-American men. As the Corvette "got caught in the traffic" ahead, Archambeau "wrote down the license plate," 2YQK292, along with the notation "red 'vette," and contacted the highway patrol.

Around 9:00 the same night, Moamer Mohamed was working at the Bottles Liquor store. As he was leaving the store he observed a red Corvette in front of the parking lot that blocked his exit. The engine of the Corvette was running and the window was open, but no one was inside. Mohamed saw

an African-American man wearing a checkered shirt and dark gloves running away from the parking lot toward downtown Oakland. Mohamed moved the Corvette and called the police. The only identifiable fingerprints found on the red Corvette belonged to K. K. Parker or the victim.

When Walton returned to her residence later that night with Hodges, Kingdom's blue Oldsmobile Cutlass was parked on the street in front of the house. She was frightened, and did not look in the car or immediately contact the police. The vehicle was located by the police, however, in front of Walton's house at 9962 Voltaire in East Oakland about 10:00 that night.

Walton was then taken into custody and transported to the Oakland Police Department for questioning. She testified at trial that she fallaciously told investigating officers that she saw defendant, Kingdom and Cross force Highsmith into the car trunk. Walton admitted that she told "lies" to the officers, but testified that she did so to try to help her friend Highsmith. Walton also testified that she received a telephone call from defendant from jail during which he said to her, "Don't go to court." Defendant offered her money not to testify. Walton also received "death threats" from other people unknown to her.[11]

Defendant was arrested about an hour after Walton was taken into custody. He was a passenger in a blue 1985 Oldsmobile Royale driven by Carl Anderson that was detained around 11:00 p.m. for expired registration tags.[12] Anderson was taken into custody on a "no-bail misdemeanor warrant," and after defendant was identified he was arrested in connection with the carjacking and kidnapping of Highsmith that afternoon. Defendant was wearing a green plaid shirt—like the one Mohamed had seen earlier that evening worn by the man who ran away from the red Corvette—and green pants; his "hair was in corn rows." Black leather gloves were found on the right front passenger seat which had been occupied by defendant, and a black leather jacket was left in the backseat of the vehicle. Both of the gloves subsequently tested positive for gunshot residue, as did the left sleeve of the jacket. No blood was detected on the jacket or gloves. No gunshot residue was found on defendant's hands.

---

[11] Walton testified at the preliminary hearing before the first trial, and at Kingdom's trial, but did not testify at defendant's first trial.

[12] The 1985 Oldsmobile Royale driven by Anderson in which defendant was arrested is not the same vehicle as the blue Oldsmobile Delta Cutlass registered to Kingdom that was observed at the scene of the kidnapping of Highsmith and seized from in front of Walton's residence.

During the interview of Walton very early the next morning, defendant was confined in a locked interview room nearby. When Walton saw defendant in the hallway she identified him as one of the men in the blue Oldsmobile at 12th and Market just before the abduction of Highsmith. She subsequently identified photographs of Cross and Kingdom from a lineup as the other two men.

The blue Oldsmobile registered to Kingdom was processed for evidence and photographed on August 5, 1995. The exterior was clean, and did not appear to have been driven on a dirt road. The top side of the muffler in the trunk was shiny and clean, and had wipe marks on it, but the bottom side was dirty. The trunk did not have indications, such as hair, blood, or fingerprints, that a person had been transported in it. No identifiable fingerprints were found anywhere on the car.

At the scene of the kidnapping at 12th and Market, three spent shell casings were recovered: two were brass nine-millimeter "Lugar caliber" casings fired from the same weapon, "an S.W.D.-type firearm;" the other, apparently of older vintage, was a brass .45-caliber semiautomatic cartridge fired from another type of weapon. A criminalist also examined the bullet extracted from the victim's head, and determined that it was fired from one of two similar size firearm calibers: a .40-caliber Smith and Wesson, or a 10-millimeter auto caliber.[13]

Warrants were issued for the arrest of Cross and Kingdom after they were identified by investigating officers as the other two men associated with the abduction of Highsmith. The Oakland Police Department was notified on August 10, 1995, that Cross had been arrested in Mississippi. Two taped statements were subsequently taken from him by investigating officers of the Oakland Police Department early the next morning. Kingdom was arrested on November 6, 1995, in Mississippi. Two days later when he was confronted with the statements made by Cross, he gave a statement to an Oakland police officer which was found inadmissible in the second appeal before this court and the federal habeas corpus proceeding.

Both taped statements made by Cross, and his testimony given at the first trial, were admitted in evidence and read to the jury at the second trial.[14] In his first statement Cross told the officers that he moved to California in 1992,

---

[13] Probably the former, which, the criminalist observed, is a more popular weapon.

[14] Cross refused to testify at the second trial and was found unavailable as a witness. The jury was aware that he was serving a life term for an unrelated murder. The jury also heard through stipulation that Kingdom was convicted after trial in 1998 for the first degree murder of Highsmith with a special circumstance of kidnapping, and was serving a sentence of life without parole.

and lived with his aunt on 55th Avenue in Oakland until a few months before his arrest, when he stayed in motels in Oakland. He stated that Kingdom is his cousin, and he met defendant through one of his drug selling partners after he began living in Oakland.

Cross reported that the Sunday before the abduction of Highsmith, his 1988 "blue Iroc" Chevrolet, which contained cash in the amount of $6,700, clothing, and other valuables, was stolen in Emeryville while he was visiting a girlfriend. He and a companion "drove around" West Oakland looking for the car. Youngsters told Cross that they had seen "some fool from Ghost Town" driving his Iroc around, so he continued to look for the car in the Ghost Town area of Oakland. Someone else told Cross that "Coco," a man with two gold teeth who lived on Adeline and "steals cars," was the one who was seen driving the Iroc around. The next day, Cross and Kingdom drove through West Oakland in the blue Oldsmobile looking for the Iroc. They heard that Coco was on 12th and Market, so they drove there. When a man named "Lon" said that he knew Coco, Cross gave him his pager number for Coco to call him.

The following day between noon and 2:00 p.m., Cross heard from Coco, who denied that he stole the Iroc. They agreed to meet at 12th and Market to discuss the matter further. With Cross driving, he, Kingdom and Cooper went to 12th and Market in the blue Oldsmobile. Cross did not find Coco among the people on the street, then walked back to the Oldsmobile. As he did, two men approached the car and one of them said, "I'm Coco." After Coco said, "I don't take cars," Cross began to "walk off." He returned to the Oldsmobile, and they drove away. He took a flight to Memphis later that night. Cross denied that they kidnapped Coco.

In his second statement taken a few hours later, Cross admitted that when he, defendant and Kingdom arrived at 12th and Market in the blue Oldsmobile, they all had nine-millimeter handguns, although he denied that he owned any of the guns or had one in his immediate possession at the scene. Cross said he was outside the car when Coco appeared with another man in a red Corvette. While he and Coco were "talking" on the sidewalk, "everything jumped off." Suddenly, Kingdom and Cooper, with guns drawn, escorted Coco to the rear of the car and forced him into the trunk. Someone fired shots, but Cross claimed it was not he.

Cross and Kingdom then got in the Oldsmobile, while defendant jumped into the red Corvette. They drove both cars to East Oakland, around 109th and Foothill, where defendant left the red Corvette and got back in the blue

Oldsmobile with them. Coco was still in the trunk. They "drove around" for a while, then returned to the E-Z 8 motel, where Cross was staying. Cross and Kingdom went into the motel room, but defendant drove away with Coco. Cross claimed that Coco was alive in the trunk when he and Kingdom left the Oldsmobile for the hotel room. Cross was in the motel room for 40 minutes to an hour packing his clothes until defendant returned in the car. Cross and Kingdom then joined defendant, and with Kingdom driving they returned to the location at 109th and Foothill where they previously parked the red Corvette. Defendant left the Oldsmobile and returned to the Corvette. Defendant drove off in the Corvette, and Cross did not see him thereafter. He and Kingdom drove the Oldsmobile to Voltaire and 100th, where they parked it. While Cross was in the Oldsmobile, he did not hear any noise or look inside the trunk.

When they left the car at Voltaire and 100th, Cross thought Coco was still alive in the trunk, and someone would find him later, although he acknowledged the "possibility" that the victim had been shot during his abduction. Cross and Kingdom also left the guns in the car and began to walk back toward MacArthur when a friend drove by and gave them a ride to the E-Z 8 motel. Cross said he traveled to Memphis the next morning. He did not know Coco was still missing until later, and "didn't think it was that serious." Cross also told the officers he did not know where Coco was.[15]

In his testimony at the first trial, Cross added details to his second statement and changed some of his account of the events. Cross testified that his blue Iroc was stolen on July 30, 1995. Taken with the car were its contents: $600 to $700 in cash,[16] large amounts of marijuana and powder cocaine that were worth thousands of dollars if sold on the street, jewelry and clothes. The drugs had been purchased the same day from defendant's friend at 100th and MacArthur. Cross financed a small portion of the drug purchase, but defendant contributed much more, between $2,000 and $4,000. Cross had intended to drive the Iroc to Greenville, Mississippi to visit his mother and sell the drugs. The theft of the car altered those plans. Defendant was "upset" when he learned the car and drugs had been stolen. He accompanied Cross and Kingdom when they searched in West Oakland for the Iroc the day before the abduction of Highsmith. Defendant used "threatening words" to someone they encountered in a green station wagon.

Cross testified that he accepted Coco's word by telephone on August 3, 1995, that he "didn't have" the car, but defendant was insistent upon going to

---

[15] At that time Highsmith's body had not yet been found.

[16] Not $6,700 as was mistakenly reported in his prior statement to the police.

12th and Market Streets to meet Coco. Defendant said: "Let's go out there," so Cross agreed. Cross drove the blue Oldsmobile to 12th and Market Streets, Kingdom sat in the front seat, and defendant was in the rear passenger seat. They parked across the street from the liquor store, near the church. Cross testified that he got out of the Oldsmobile to talk to people on the street in an effort to locate Coco, but left his gun on the front seat of the car. He claimed that he did not see or talk to Walton and Hodges. As he "was walking toward the car," a red Corvette driven by K. K. Parker drove up and parked behind the Oldsmobile. Parker went to the liquor store, and the other man in the Corvette walked up to Cross on the sidewalk and said, "I'm Coco." Coco said, "I don't take cars," and claimed he had not seen the Iroc. While holding a gun in one hand, defendant then grabbed Coco from behind and backed him into the trunk of the Oldsmobile. Cross got in the front passenger seat of the car as defendant told Kingdom to get the keys from the ignition and open the trunk. Cross "heard shots" from behind the car, probably "about six," and ducked down. He did not know if Coco was shot, but thought it was "a possibility." The trunk was then shut and Kingdom ran to the front passenger side of the Oldsmobile. Cross "scooted" into the driver's seat, took the keys from Kingdom, and drove away after Kingdom exclaimed, "be out." Defendant drove off in the red Corvette.

When they reached 100th and Voltaire Streets, the red Corvette was abandoned. They drove in the Oldsmobile to the E-Z 8 motel, where Cross and Kingdom left the car. Cross went to his room to pack for his planned trip to Mississippi. Defendant returned to the motel and they all drove to 100th and MacArthur. Cross did not know if Highsmith was still in the trunk of the car. Cross exited the car there before defendant and Kingdom "drove off" without him. After a few minutes, one of Cross's partners named Jay "pulled up" in a blue Toyota. Cross and Jay "drove around" and smoked some joints for a while before they returned to 100th and MacArthur and saw Oakland police officers "all over the place." Cross asked Jay to take him back to the E-Z 8 motel. Kingdom arrived later at the motel room without his car. They did not discuss the fate of Highsmith or events that occurred earlier that day. Cross left the next morning for Mississippi, where he was arrested a few days later. He testified that he "wasn't being truthful" entirely in his two statements to the police to "cover" for defendant and Kingdom.

## DISCUSSION

### I. *The Effect of the Federal District Court's Ruling upon the Retrial of Defendant for Murder.*

We first confront defendant's claim that the federal district court's decision in the writ proceeding precludes the present murder conviction. Defendant

claims that the effect of the district court's finding of insufficient evidence to support the conviction—without Kingdom's inadmissible statement—is "to bar his conviction on substantially the same evidence, under either or both of the 'collateral estoppel' or 'law of the case' doctrines." He maintains that the trial court in the present proceeding erred by failing to grant his motions to dismiss the case, and that the judgment must now be reversed. We therefore proceed to an examination of the collateral estoppel and law of the case doctrines as related to the federal district court's order granting defendant's petition for writ of habeas corpus.

## A. *Collateral Estoppel.*

■ "In criminal cases, the doctrine of collateral estoppel is derived from the double jeopardy clause in the Fifth Amendment." (*In re Cruz* (2003) 104 Cal.App.4th 1339, 1344 [129 Cal.Rptr.2d 31].) "The bar of collateral estoppel prevents relitigation of an issue actually and necessarily decided in a previous civil or criminal action. [Citations.] The principles of res judicata and collateral estoppel provide ' "that a final judgment on the merits bars the parties or those in privity with them from litigating the same cause of action in a subsequent proceeding and collaterally estops parties or those in privity with them from litigating in a subsequent proceeding on a different cause of action any issue actually litigated and determined in the former proceeding. . . . [Citations.]" [Citation.]' [Citations.]" (*People v. Howie* (1995) 41 Cal.App.4th 729, 736 [48 Cal.Rptr.2d 505]; see also *McCutchen v. City of Montclair* (1999) 73 Cal.App.4th 1138, 1144 [87 Cal.Rptr.2d 95]; *People v. Meredith* (1992) 11 Cal.App.4th 1548, 1556 [15 Cal.Rptr.2d 285].) "[F]ive threshold requirements" must be established for collateral estoppel to bar relitigation of an issue: "1) the issue to be precluded must be identical to that decided in the prior proceeding; 2) the issue must have been actually litigated at that time; 3) the issue must have been necessarily decided; 4) the decision in the prior proceeding must be final and on the merits; and 5) the party against whom preclusion is sought must be in privity with the party to the former proceeding." (*People v. Garcia* (2006) 39 Cal.4th 1070, 1077 [48 Cal.Rptr.3d 75, 141 P.3d 197]; see *People v. Vogel* (2007) 148 Cal.App.4th 131, 136 [55 Cal.Rptr.3d 403].) The purposes of the collateral estoppel doctrine have been identified "as promoting judicial economy by minimizing repetitive litigation, preventing inconsistent judgments that undermine the integrity of the judicial system, and providing repose by preventing a person from being harassed by vexatious litigation." (*People v. Lawley* (2002) 27 Cal.4th 102, 163 [115 Cal.Rptr.2d 614, 38 P.3d 461]; see also *Syufy Enterprises v. City of Oakland* (2002) 104 Cal.App.4th 869, 878 [128 Cal.Rptr.2d 808].)

■ The United States Supreme Court has "stated that 'the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." [Fn. omitted.] The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." [Citation.]' [Citation.]" (*People v. Santamaria* (1994) 8 Cal.4th 903, 912 [35 Cal.Rptr.2d 624, 884 P.2d 81], quoting *Ashe v. Swenson* (1970) 397 U.S. 436, 444 [25 L.Ed.2d 469, 90 S.Ct. 1189].) "In deciding whether the doctrine is applicable in a particular situation a court must balance the need to limit litigation against the right of a fair adversary proceeding in which a party may fully present his case." (*Gutierrez v. Superior Court* (1994) 24 Cal.App.4th 153, 158 [29 Cal.Rptr.2d 376].) "A criminal defendant who asserts 'constitutional collateral estoppel' has the 'burden of establishing the factual predicate for the application of the doctrine . . . .' [Citation.]" (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1187 [5 Cal.Rptr.3d 615].)

Like the California Supreme Court, we express grave doubts that the collateral estoppel doctrine even has application to the retrial of defendant in the *same proceeding* following a reversal of his conviction and the order for a retrial. (*People v. Barragan* (2004) 32 Cal.4th 236, 253 [9 Cal.Rptr.3d 76, 83 P.3d 480].) While the issue has not been definitively resolved, the "high court has never suggested the doctrine applies to the same proceeding. Indeed, it has consistently stated it applies to 'successive prosecutions.' [Citation.] In *Ohio* v. *Johnson* (1984) 467 U.S. 493, 500, footnote 9 [81 L.Ed.2d 425, 434, 104 S.Ct. 2536], the court specifically stated, 'Moreover, in a case such as this, where the State has made no effort to prosecute the charges seriatim, the considerations of double jeopardy protection implicit in the application of collateral estoppel are inapplicable.' In *United States* v. *Dixon* (1993) 509 U.S. [688] [125 L.Ed.2d 556, 113 S.Ct. 2849], a case involving successive prosecutions, the high court, although expressly not deciding the collateral estoppel question in that case because the lower courts had not ruled on it [citation], noted at page [705] [125 L.Ed.2d at pp. 572–573, 113 S.Ct. at p. 2860] that '[t]he collateral-estoppel effect attributed to the Double Jeopardy Clause, [citation], may bar a *later prosecution* for a separate offense where the Government has *lost* an earlier prosecution involving the same facts.' (First italics in original, second italics added.) Most recently, the

court has stated, 'Where . . . there is "no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended." [Citation.] Thus, our cases establish that the primary evil to be guarded against is successive prosecutions: "[T]he prohibition against multiple trials is the controlling constitutional principle." [Citation.]' [Citation.]" (*People v. Santamaria, supra*, 8 Cal.4th 903, 913; see also *Schiro v. Farley* (1994) 510 U.S. 222, 229–230 [127 L.Ed.2d 47, 56–57, 114 S.Ct. 783, 789]; *People v. Memro* (1995) 11 Cal.4th 786, 821 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; *People v. Morales, supra*, 112 Cal.App.4th 1176, 1186; *Lennane v. Franchise Tax Bd.* (1996) 51 Cal.App.4th 1180, 1185–1186 [59 Cal.Rptr.2d 602].)

■ But also like the California Supreme Court, we need not resolve this threshold issue, as we conclude that defendant's collateral estoppel claim fails for another reason: the lack of a final adjudication and decision on the merits that the murder conviction is precluded by lack of evidence. (See *People v. Barragan, supra*, 32 Cal.4th 236, 253–254.) Finality is "a cornerstone" of the collateral estoppel doctrine. (*People v. Scott* (2000) 85 Cal.App.4th 905, 918 [102 Cal.Rptr.2d 622], citing *People v. Mitchell* (2000) 81 Cal.App.4th 132, 143–148, 155 [96 Cal.Rptr.2d 401], disapproved on other grounds in *Barragan, supra*, at p. 252.) Principles of double jeopardy do not attach "until there has been a final determination on the merits, which does not occur simply because a finding was made in an ongoing proceeding." (*People v. Burbine* (2003) 106 Cal.App.4th 1250, 1260 [131 Cal.Rptr.2d 628].) "[C]ollateral estoppel applies only when it is shown that a factual issue which is identical to an issue in the current case was actually litigated and necessarily determined in a prior, final adjudication." (*Johnson v. Lewis* (2004) 120 Cal.App.4th 443, 456 [15 Cal.Rptr.3d 507]; see also *People v. Barragan, supra*, at pp. 252–255; *In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1522 [42 Cal.Rptr.3d 370].) "Thus, in order for res judicata or collateral estoppel to apply there must be a *final* judgment or determination of an issue; that is, a judgment or determination that is final in the sense that *no further judicial act remains to be done to end the litigation*. [Citation.] These principles apply in criminal proceedings as well as civil." (*People v. Scott, supra*, at p. 919, second italics added; see also *Yeboah v. Progeny Ventures, Inc.* (2005) 128 Cal.App.4th 443, 448 [27 Cal.Rptr.3d 150].)

We do not consider the federal district court's decision a final judgment within the meaning of the collateral estoppel doctrine. For purposes of issue preclusion, " ' "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.' [Citations.]" (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1564 [49 Cal.Rptr.3d 259], italics omitted.) " '[A] "final judgment" is defined as one that is "free from direct

attack." [Citation.] Stated differently, "To be 'final' for purposes of collateral estoppel the decision need only be immune, as a practical matter, to reversal or amendment." [Citation.]' " (*People v. Santamaria, supra*, 8 Cal.4th 903, 942 (appen. to conc. & dis. opn. of Mosk, J.); see also *id.* at p. 929, fn. 1 (conc. & dis. opn. of Mosk, J.).) It is " 'the substance and effect of the court's order or judgment and not the label' which determines" whether it is final. (*Pazderka v. Caballeros Dimas Alang, Inc.* (1998) 62 Cal.App.4th 658, 666 [73 Cal.Rptr.2d 242]; see also *Belio v. Panorama Optics, Inc.* (1995) 33 Cal.App.4th 1096, 1101 [39 Cal.Rptr.2d 737].) When " 'no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties,' " it is not. (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 698 [107 Cal.Rptr.2d 149, 23 P.3d 43], citing *Lyon v. Goss* (1942) 19 Cal.2d 659, 670 [123 P.2d 11]; see also *Public Defenders' Organization v. County of Riverside* (2003) 106 Cal.App.4th 1403, 1410 [132 Cal.Rptr.2d 81]; *People v. Scott, supra*, 85 Cal.App.4th 905, 919; *Jacobs-Zorne v. Superior Court* (1996) 46 Cal.App.4th 1064, 1070 [54 Cal.Rptr.2d 385].) And where, as here, collateral estoppel is "asserted in the same proceeding, the question of 'finality' is obviously a predicate inquiry. While the proceeding or action still continues, the required finality is necessarily absent." (*People v. Scott, supra*, at p. 919.)

Neither the intent nor the substance of the federal court's decision is indicative of a *final* determination on the sufficiency of the evidence to support the murder charge. First, the court did not determine that the jury verdict was unsupported by the evidence presented at trial. To the contrary, the court concluded that the evidence was "sufficient when the improperly admitted evidence" of Kingdom's statement was considered—as it was at trial—and only "insufficient when the improperly admitted evidence [was] excluded from the equation." The proper remedy in "such a case," the federal court declared is "retrial rather than acquittal." Rather than reverse and finally set aside the murder conviction for lack of supporting evidence, the court expressly remanded the case for retrial to grant the People the opportunity to present the case against defendant anew. Thus, the court did not intend that its decision have any preclusive effect or prevent the retrial of defendant. (See *People v. Scott, supra*, 85 Cal.App.4th 905, 919–921.) The federal court's disposition of the case was effectively "an order for a new trial, placing the parties in the same position as if the cause had never been tried." (*People v. Moore* (2006) 39 Cal.4th 168, 174 [45 Cal.Rptr.3d 784, 137 P.3d 959].) "Absent a contrary direction from the appellate court, a general reversal of a criminal judgment is deemed to be an order for a new trial." (*Scott, supra*, at

p. 921, italics omitted.) ■ Collateral estoppel precludes retrial only if "no further judicial act remains to be done to end the litigation" of an issue. (*Id.* at p. 919.) A " 'conclusive carry-over effect should not be accorded a judgment which is considered merely tentative in the very action in which it was rendered. On the contrary, the judgment must ordinarily be a firm and stable one, the "last word" of the rendering court—a "final" judgment.' [Citations.]" (*Id.* at pp. 919–920, italics omitted.) The judgment before us clearly contemplated and mandated the very retrial which occurred, not an end to the case. (*Id.* at p. 923.)

The federal court's remand order was in accord with the rule that double jeopardy and collateral estoppel principles do not bar retrial upon reversal for error in the proceedings below. (*Lockhart v. Nelson* (1988) 488 U.S. 33, 42 [102 L.Ed.2d 265, 109 S.Ct. 285]; *United States v. Scott* (1978) 437 U.S. 82, 90–91 [57 L.Ed.2d 65, 98 S.Ct. 2187]; *People v. Hernandez* (2003) 30 Cal.4th 1, 7 [131 Cal.Rptr.2d 514, 64 P.3d 800]; *People v. Hatch* (2000) 22 Cal.4th 260, 271–274 [92 Cal.Rptr.2d 80, 991 P.2d 165]; *People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 72 [2 Cal.Rptr.2d 389, 820 P.2d 613].) Only reversals based on the legal insufficiency of the evidence at trial may prevent the People from retrying a defendant whose conviction is set aside through direct appeal or collateral attack. (See *Lockhart v. Nelson, supra,* at p. 38; *People v. Seel* (2004) 34 Cal.4th 535, 544 [21 Cal.Rptr.3d 179, 100 P.3d 870]; *People v. Santamaria, supra,* 8 Cal.4th 903, 910–911; *In re Cruz, supra,* 104 Cal.App.4th 1339, 1348–1349.) And even "where an appellate court finds that 'the evidence is insufficient to support the verdict,' the 'normal rule' is that the losing party on appeal is 'entitled to a retrial.' [Citation.]" (*People v. Barragan, supra,* 32 Cal.4th 236, 250.) "As a general rule, when there is a conviction, rather than an acquittal or a mistrial, and the judgment of conviction is reversed on appeal or vacated in habeas corpus proceedings due to error in the trial, retrial is permitted. . . . When a writ of habeas corpus vacates a judgment, the parties are placed in the same position as if the first trial had never occurred, and defendant is not in jeopardy until the retrial jury is sworn." (*Sons v. Superior Court* (2004) 125 Cal.App.4th 110, 118 [22 Cal.Rptr.3d 647], fn. omitted.) "The Supreme Court has held that the double jeopardy clause bars retrial 'for the defendant who obtains an appellate determination that the trial court should have entered a judgment of acquittal' based on insufficiency of the evidence. [Citation.] The double jeopardy clause does not bar retrial after a reversal based on the erroneous admission of evidence if the erroneously admitted evidence supported the conviction." (*U.S. v. Chu Kong Yin* (9th Cir. 1991) 935 F.2d 990, 1001, italics omitted; see also *In re Anthony C., supra,* 138 Cal.App.4th 1493, 1509–1510.)

The federal court's decision was not functionally equivalent to an acquittal based upon failure of proof at trial for double jeopardy or collateral estoppel purposes—the evidence presented at trial was found sufficient to support the

conviction—but rather a determination that defendant was convicted through a judicial process which was fundamentally defective due to improper receipt of evidence. (Cf. *Lockhart v. Nelson, supra,* 488 U.S. 33, 41; *People v. Hatch, supra,* 22 Cal.4th 260, 271–272; *People v. McCann* (2006) 141 Cal.App.4th 347, 354–355 [45 Cal.Rptr.3d 868].) The federal court's finding "compels a retrial; it does not bar one." (*In re Cruz, supra,* 104 Cal.App.4th 1339, 1347.) The very order that defendant asks us now to accord "preclusive effect was clearly interlocutory in nature. A remand was ordered to provide the People with the opportunity to present additional evidence" on the charges. (*People v. Scott, supra,* 85 Cal.App.4th 905, 919, italics omitted.) "Clearly, this was not a final order." (*Ibid.,* italics omitted.) The retrial order " 'simply "affords the defendant a second opportunity to seek a favorable judgment" and does not violate the constitutional prohibition against double jeopardy' " or the collateral estoppel doctrine. (*People v. Hernandez, supra,* 30 Cal.4th 1, 7, quoting *People v. Hatch, supra,* at p. 274.)

■ Further, affording finality to the federal court's decision would be inconsistent with the nature and purpose of the writ of habeas corpus in the present case. We acknowledge that " '[t]he writ of habeas corpus affords an efficacious means of vindicating an individual's fundamental rights. [Citation.] . . . A final order or judgment granting relief to a petitioner on habeas corpus is a conclusive determination . . . [;] it is res judicata of all issues of law and fact necessarily involved in that result. [Citations.]' [Citation.]" (*People v. Mitchell, supra,* 81 Cal.App.4th 132, 146–147, citing *In re Crow* (1971) 4 Cal.3d 613, 622–623 [94 Cal.Rptr. 254, 483 P.2d 1206], disapproved on other grounds in *People v. Barragan, supra,* 32 Cal.4th 236, 252.) But here, the habeas corpus proceeding "is not a trial of guilt or innocence and the findings of the habeas corpus court do not constitute an acquittal. The scope of a writ of habeas corpus is broad, but in this case, as in most cases, it is designed to correct an erroneous conviction. It achieves that purpose by invalidating the conviction and restoring the defendant to the position she or he would be in if there had been no trial and conviction. [Citations.] [¶] Thus, the conviction is set aside but the prosecution is not ended." (*In re Cruz, supra,* 104 Cal.App.4th 1339, 1346.)

■ Prohibiting retrial of the murder charge would also contravene the People's right to a jury trial and conflict with the strong public policy considerations that favor determination of guilt or innocence in a trial. (*In re Cruz, supra,* 104 Cal.App.4th 1339, 1347.) The first jury, having heard and considered all of the evidence, convicted defendant of murder. Reversal of the conviction for the erroneous admission of Kingdom's statement, a due process violation according to the federal court's decision, did not transform the conviction into an effective acquittal. The second jury was given the

opportunity by the federal court to assess the evidence presented and ultimately reach the same conclusion on his guilt of the murder of Highsmith. (See *People v. Santamaria, supra,* 8 Cal.4th 903, 925–926.) Declining to apply collateral estoppel principles after appellate reversal of the jury's finding neither created the risk of inconsistent verdicts nor resulted in the sort of harassment of multiple trials that the doctrine seeks to avoid. (*People v. Barragan, supra,* 32 Cal.4th 236, 256–257; *People v. Santamaria, supra,* at p. 914.) The murder conviction by the second jury was consistent, not inconsistent, with the verdict after the first trial, and did not constitute vexatious litigation. (*People v. Taylor* (1974) 12 Cal.3d 686, 695 [117 Cal.Rptr. 70, 527 P.2d 622].) We therefore find that the federal court's decision was not a final judgment for purposes of prohibiting a retrial of defendant under collateral estoppel principles. (*People v. Monge* (1997) 16 Cal.4th 826, 844–845 [66 Cal.Rptr.2d 853, 941 P.2d 1121]; *People v. Bueno* (2006) 143 Cal.App.4th 1503, 1510 [50 Cal.Rptr.3d 161]; *People v. Sotello* (2002) 94 Cal.App.4th 1349, 1356 [115 Cal.Rptr.2d 118]; *People v. Scott, supra,* 85 Cal.App.4th 905, 914, 921.)

## B. *The Law of the Case Doctrine.*

■ We turn our attention to the related doctrine of law of the case. "The law of the case doctrine holds that when an appellate opinion states a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to through its subsequent progress in the lower court and upon subsequent appeal. [Citations.] For the doctrine to apply, ' " 'the point of law involved must have been necessary to the prior decision, . . . the matter must have been actually presented and determined by the court, and . . . application of the doctrine will not result in an unjust decision.' [Citations.]" [Citation. ]' [Citation.]" (*People v. Superior Court (Plascencia)* (2002) 103 Cal.App.4th 409, 432 [126 Cal.Rptr.2d 793].) " 'The principal reason for the doctrine is judicial economy. "Finality is attributed to an initial appellate ruling so as to avoid the further reversal and proceedings on remand that would result if the initial ruling were not adhered to in a later appellate proceeding." ' [Citations.] The law of the case doctrine applies in criminal cases [citation] . . . ." (*People v. Gray* (2005) 37 Cal.4th 168, 196–197 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

■ The "doctrine of law of the case does not prevent retrial of an issue, although it does require that the same conclusion be reached if that matter is retried on the same evidence." (*People v. Burbine, supra,* 106 Cal.App.4th 1250, 1261.) "Thus, the law-of-the-case doctrine 'prevents the parties from seeking appellate reconsideration of an already decided issue in the same case

absent some significant change in circumstances.' [Citation.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 441 [42 Cal.Rptr.3d 677, 133 P.3d 581].) "The doctrine will not be applied, however, when such application leads to an unjust result. Because the law of the case doctrine 'is merely one of procedure and does not go to the jurisdiction of the court [citations], the doctrine will not be adhered to where its application will result in an unjust decision, e.g., where there has been a "manifest misapplication of existing principles resulting in substantial injustice" [citation], or the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations [citation]. The unjust decision exception does not apply when there is a mere disagreement with the prior appellate determination.' [Citation.]" (*People v. Gray, supra,* 37 Cal.4th 168, 197; see also *People v. Martinez* (2003) 31 Cal.4th 673, 683 [3 Cal.Rptr.3d 648, 74 P.3d 748].)

As with the collateral estoppel doctrine, we are persuaded that law of the case principles do not govern the retrial of defendant in the present case, for several reasons. First, no finding has ever been made that the evidence presented during the first trial failed to support the murder conviction. The first jury, two opinions from this court, and even the federal district court, ruled otherwise. The conclusion of the federal court, which we find rather confusing, was that defendant's "right to due process was violated" by the insufficient "evidence to support the murder conviction" adduced at a hypothetical trial—that is, one without evidence of Kingdom's statement. The court's finding was made in the context of its determination that the admission of Kingdom's statement was "not harmless error," and that the cumulative impact of prosecutorial misconduct, improper admission of evidence, and the due process violation, "considered together, prejudiced Cooper so much that his conviction [*sic*] on all counts must be set aside." We have great difficulty imposing upon the second jury the federal court's evaluation of the evidence as "insufficient," when the "evidence" referred to by the court was not that offered at the first trial. We perceive in the application of the law of the case doctrine here a manifest injustice to the prosecution, which did not have the benefit of a prior definitive ruling on the admissibility of Kingdom's statement and the opportunity to present additional evidence at the first trial in light of its ultimate exclusion. We therefore do not consider the issue of the sufficiency of the evidence to support the jury verdict on the murder charge to have been actually adjudicated and finally determined by the federal court for purposes of imposition of the law of the case doctrine.[17]

Second, the federal court's finding of insufficient evidence to support the murder conviction is, at best, only marginally a statement of a rule of law in the case. We acknowledge that law of the case principles may attach to a

---

[17] And to the extent it was determined, it was adverse to defendant.

written resolution of a writ of habeas corpus petition, and further that legal sufficiency of the evidence may be an issue of law that invokes adherence to a reviewing court's statement of decision. (*Kowis v. Howard* (1992) 3 Cal.4th 888, 894 [12 Cal.Rptr.2d 728, 838 P.2d 250]; *In re Crow, supra*, 4 Cal.3d 613, 622–623; *People v. Pacini* (1981) 120 Cal.App.3d 877, 887 [174 Cal.Rptr. 820].) "[A]n appellate court's determination 'that the evidence is insufficient to justify a finding or a judgment is necessarily a decision upon a question of law.' ([*Estate of Baird* (1924) 193 Cal. 225,] 238 [223 P. 974].) Such a determination 'establishe[s] as the law of the case that all the evidence adduced at the previous trial was insufficient as a matter of law to establish' the finding or judgment. (*Id.* at p. 234; see also *People v. Shuey* (1975) 13 Cal.3d 835, 842 [120 Cal.Rptr. 83, 533 P.2d 211] [doctrine applies to finding of evidence's 'legal sufficiency'].)" (*People v. Barragan, supra*, 32 Cal.4th 236, 246.) "With regard to the question of the legal sufficiency of evidence, the general rule is that '[w]here the sufficiency of the evidence to sustain the judgment depends on the probative value or effect of the evidence itself (*as distinguished from the credibility of witnesses*), and there is no substantial difference in the evidence in the retrial, the former decision is law of the case. [Citations.]' [Citation.]" (*People v. Mitchell, supra*, 81 Cal.App.4th 132, 149, italics added, disapproved on other grounds in *People v. Barragan, supra*, at p. 250.)

 However, "[T]he law-of-the-case doctrine governs only the *principles of law* laid down by an appellate court, as applicable to a retrial of fact, and it controls the outcome on retrial only to the extent the evidence is substantially the same." (*People v. Boyer, supra*, 38 Cal.4th 412, 442.) The doctrine is subject to an important limitation: it " 'does not embrace the facts themselves . . . .' [Citation.]" (*People v. Barragan, supra*, 32 Cal.4th 236, 246.) Here, the federal court's finding of the insufficiency of the evidence to sustain the judgment did not depend solely upon an assessment of the probative value of the evidence, but, as we read the decision, was primarily based upon evaluations of the credibility of prosecution witnesses and inferences drawn by the court that were contrary to those of the first jury. We do not interpret the federal court's decision as a final declaration of a principle of law in the case. (See *People v. Scott, supra*, 85 Cal.App.4th 905, 919.)

 Finally, and of most significance to us, the second jury was presented with different evidence to assess. In a criminal case, law of the case principles only come into play if upon remand the People attempt to prove an allegation "using only the evidence presented at the first trial." (*People v. Scott, supra*, 85 Cal.App.4th 905, 924.) The law of the case doctrine does not prevent a retrial, does not preclude the presentation of new evidence upon

remand, does not limit the new evidence a party may introduce at a retrial, and only compels the same result if the People attempt on remand to prove the charge using the substantially same evidence. (*People v. Boyer, supra,* 38 Cal.4th 412, 442; *People v. Jenkins* (2006) 140 Cal.App.4th 805, 816 [44 Cal.Rptr.3d 788]; *People v. Franz* (2001) 88 Cal.App.4th 1426, 1456 [106 Cal.Rptr.2d 773]; *People v. Scott, supra,* at p. 924.) "Even where the appellate court reverses based on 'the "sufficiency of the evidence", the rule of the law of the case may not be extended to be an estoppel when new material facts, or evidence, or explanation of previous evidence appears in the subsequent trial. [Citations.]' [Citation.]" (*People v. Barragan, supra,* 32 Cal.4th 236, 246–247; see also *People v. Monge, supra,* 16 Cal.4th 826, 845.)

Upon comparison of the first and second trials, we find that the evidence presented was not the same. Kingdom's statement had been excluded, so it was of course not considered in the second trial.[18] Critical testimony from Juanita Walton was received at the second trial, rather than read from her prior statements or abbreviated preliminary hearing testimony as it had been at the first trial. Walton corroborated the testimony of Hodges that identified defendant and placed him at the scene of the kidnapping of Highsmith only moments before the crime occurred. Walton's testimony also provided corroborated testimony from Cross that Highsmith was confronted and abducted because defendant, along with Cross and Kingdom, believed he had stolen a vehicle containing their drugs-thereby providing a motive for the abduction and killing.[19] The accounts of the kidnapping given by Hodges, Rodney Love and Musa Hussein varied from the first trial, although not materially so. The defense evidence at the second trial also did not include alibi testimony from defendant or his wife. Given the context of the federal court's finding of insufficiency of the evidence and upon our review of the record, we conclude that a retrial of defendant was not precluded and the jury was not estopped by law of the case principles from convicting defendant of the murder of Highsmith. (*McCutchen v. City of Montclair, supra,* 73 Cal.App.4th 1138, 1148.)

II.–VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[18] Favorable to the prosecution or not, the exclusion of Kingdom's statement certainly made the evidence substantially different in the second trial.

[19] Walton testified that defendant asked if Highsmith was the "type of nigger" who would steal a car.

*See footnote, *ante,* page 500.

## DISPOSITION

Accordingly, the judgment is affirmed.[23]

Marchiano, P. J., and Stein, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 25, 2007, S152666. Werdegar, J., did not participate therein.

---

[23] In his petition for writ of habeas corpus, defendant has repeated and embellished upon some of the issues presented on appeal, claimed that his appellate attorney failed to raise additional claims of error recommended by defendant, and charged his trial counsel with ineffective representation. We have found no merit to the contentions made by defendant, and therefore have denied the petition for writ of habeas corpus by separate order filed this same date. (*In re Cooper* (Apr. 6, 2007, A114440).)