Filed 9/24/15  P. v. Urbina CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ISAAC URBINA et al.,<br><br>    Defendants and Appellants. | B252819<br><br>(Los Angeles County<br>Super. Ct. No. BA387245) |
| In re JORGE CORNEJO,<br><br>    On Habeas Corpus. | B262676<br><br>(Los Angeles County<br>Super. Ct. No. BA387245) |

APPEALS from judgments of the Superior Court of Los Angeles County.  Larry P. Fidler, Judge.  Judgment as to Urbina reversed and remanded with directions. Judgment as to Cornejo reversed; petition for habeas corpus denied as moot.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant Jorge Cornejo.

Kim Malcheski, under appointment by the Court of Appeal, for Defendant and Appellant Isaac Urbina.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Marc A. Kohm and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found Jorge Cornejo and Isaac Urbina guilty of first degree premeditated murder with gang and firearm enhancements. We reverse Cornejo's conviction because the trial court erred by admitting into evidence against him a letter written by Urbina. We deny Cornejo's habeas corpus petition as moot. We reverse Urbina's conviction in light of our Supreme Court's opinion in *People v. Chiu* (2014) 59 Cal.4th 155, 158-159, that an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine. We remand Urbina's case to the trial court to allow the People to decide whether to accept a reduction in the verdict to second degree murder or to retry the case on a different theory.

### FACTS AND PROCEEDINGS BELOW

Eddie Ochoa, a member of the Lott 13 gang, was shot and killed on or about the night of September 18, 2008, on the sidewalk in front of his apartment building.

His girlfriend, Patricia Munoz, testified that she and Ochoa had been arguing loudly when they heard a male voice calling Ochoa to come outside. Munoz did not recognize the voice. Ochoa left the apartment saying that he would be right back. A short time later Munoz heard gunshots and rushed out to the street where she found Ochoa lying on the ground. She saw no one nearby. Munoz died at the scene.

Two persons who lived across the street from Ochoa told police that they were pulling out of their driveway that evening when they saw Ochoa standing on the sidewalk talking to two men they did not recognize and never identified. As they drove away they passed a black Chrysler with chrome rims parked in a dirt lot. They had never before seen that car in the neighborhood. They next heard gunshots and sped off.

Detective Robert Gray investigated Ochoa's murder. Early in his investigation Gray learned that two days before Ochoa was killed he head-butted the 14-year-old nephew of another Lott 13 gang member, Isaac Urbina. Gray drove past Urbina's home and saw a black Chrysler parked in front that matched the description of the car parked

2

near the scene of the murder. The car was registered to Urbina's mother. On a stakeout, Gray saw Urbina get into the Chrysler and drive away.

After Urbina was arrested on an unrelated charge, Detective Gray interviewed him several times about Ochoa's murder. Each time Urbina named a different person as the shooter but he also revealed knowledge about aspects of the crime that had not been released to the public. In one of the interviews Urbina admitted that his mother's Chrysler had been used in the crime and claimed that his girlfriend, Janet Contreras, was the driver. Following this interview Gray informed Urbina that he would be charged with the Ochoa murder.

Soon after filing the murder charge against Urbina, Gray interviewed Urbina's girlfriend, Contreras. Gray told Contreras he had information that she was present when Ochoa was murdered. When Contreras denied it, Gray played her a portion of a recorded interview with Urbina in which Urbina stated Contreras "would do anything he told her to do, and he was going to have her take the fall[.]" After Contreras heard Urbina's statement, she became cooperative and told Gray what she knew about the murder.

Contreras's admissions to Gray led to her arrest.

Over a two-year period Urbina wrote more than 20 letters from his jail cell to Contreras in hers. In one of those letters introduced at trial Urbina told her how he described Ochoa's murder and his involvement in the crime to Detective Gray. Urbina wrote that he first went to "Cheese," one of the leaders of the Lott 13 gang and told him that Ochoa "put hand[s] on my little nephew . . . and b[r]ought up [Ochoa's] history of being a chomo [child molester]." (Block capitals omitted.) Cheese spoke to "G' Eyes Louie," another gang leader, who talked to "Eazy 'O" the gang's shot caller. (Block capitals omitted.) According to Urbina, Easy O passed a message back: "Fuck'em do what we want." (Block capitals omitted.) When Urbina and Contreras left Cheese's house "Carnalito [Contreras's younger brother] picked us up and went cruising" looking for Ochoa. (Block capitals omitted.) When they saw Cornejo, they stopped and picked him up. Cornejo had a gun. Urbina continued: "So again we went looking for [Ochoa]

3

until we notice he had a fight with his lady, hearing all the yelling so we pull over. Me and [Cornejo] got out [of the] car. I called [Ochoa] out. We talked to him then [Cornejo] let him have it 5 shots. I ran, open[ed] the door. [Cornejo] got in and told us hurry up and drive and for us not to say nada [nothing] to any[]one." (Block capitals omitted.) Urbina then told Contreras: "You can get mad all you want but it's bad already . . . so we better off telling them [Cornejo] did what he did." (Block capitals omitted.) Urbina said that in speaking to law enforcement, he "did it for trust and so they won[']t fuck us all, if anything me & [Cornejo] will fall but [Cornejo] charge for the murder." (Block capitals omitted.)

In the same letter Urbina wrote that the story he had told police "made me look good [although] it can backfire and get found guilty but I admitted of being there and witness so at [least] it shows me being honest and help them get this case right." (Block capitals omitted.)

Contreras ultimately pleaded guilty to being an accessory (Pen. Code, § 32) and admitted a gang enhancement in exchange for a four-year prison sentence. Contreras was the prosecution's chief witness at trial.

Contreras testified as follows.

A few days prior to the murder she heard Urbina's sister tell Urbina that Ochoa had head-butted her 14-year-old son on his nose.

On the night of the murder, Contreras and Urbina went out in Urbina's mother's black Chrysler. Contreras drove. Urbina told her they were going to see Ochoa who "needed to get checked." Contreras interpreted this to mean Ochoa would be "getting his ass beat." Urbina told Contreras he had spoken with Cheesy and gotten the okay to "check" Ochoa.

Contreras and Urbina cruised around for a while then picked up Cornejo at a street corner. The three of them continued cruising until Urbina finally said that he wanted to go talk to Ochoa. Cornejo responded, "'Let's go.' . . . 'Let's do this, let's go check this fool.'"

4

Urbina gave Contreras directions to the apartment where Ochoa lived. On the way Urbina said, "'Nobody is going to be doing that to my family and get away with it.'"

Contreras stopped in front of Ochoa's apartment which was in the territory of the Geraghty gang, a rival of Lott 13. They could hear a man and a woman arguing loudly in one of the apartments. Contreras started to drive away but Urbina said: "'Let's go back and talk to him.'" Contreras parked down the street from Ochoa's apartment at the edge of a dirt lot. Urbina or Cornejo said: "'Yeah, fuck, yeah. Let's do this. This is good timing.'"

Urbina got out of the car, walked back to Ochoa's apartment and started calling to him to come out. Ochoa came outside and spoke with Urbina. A short while later Cornejo got out of the car. Contreras then heard shots and ducked down. Urbina and Cornejo ran to the car and jumped into the back seat. Contreras drove away. When she asked what happened, Urbina replied they had been shot at by members of the Geraghty gang.

Urbina and Cornejo called no witnesses.

A jury found the defendants guilty of first degree murder and found true the firearm and gang enhancement allegations.

## DISCUSSION

I. *Cornejo's Conviction Must Be Reversed Because Of The Improper Admission of Urbina's Letter Against Him.*

We reverse Cornejo's conviction on the ground that the trial court erred by admitting Urbina's letter into evidence against Cornejo. Although the letter contained self-incriminating statements, its primary function was to shift blame for the crime from Urbina to Cornejo. For this reason, it did not fall within the hearsay exception for declarations against penal interest. (Evid. Code, § 1230.).

A defendant's statement "that is facially inculpatory of the declarant may, when considered in context, *also* be exculpatory or have a net exculpatory effect." (*People v. Duarte* (2000) 24 Cal.4th 603, 612.) If a defendant's statement includes portions that are contrary to his penal interest, while other portions are self-serving, "only those portions

5

of [the declarant's] statements that were 'specifically disserving' [citation] to his penal interests [are] admissible under section 1230." (*Ibid.*)

In the letter, Urbina gave a detailed account of what he claimed happened on the night of the murder. Urbina's purpose in writing with such detail could not have been to confess or to inform Contreras about what happened, as Contreras had witnessed all these events herself. Instead, Urbina intended to tell Contreras "what I told" the police, presumably so that Contreras would tell the same story. (Block capitals omitted.) As he warned Contreras, "if the story ain[']t right <u>we could all go down</u>!" (Block capitals omitted.) This echoed the language of earlier letters, in which Urbina had repeatedly lobbied Contreras to "get our story's together and we can work out a deal." (Block capitals omitted.) Although Urbina claimed that the version of events in the letter was true, he had made similar claims about a very different version of the story in an earlier letter.

In lobbying Contreras, Urbina intended to convince her to turn against Cornejo: "Right now, we stick together of our case and do what[']s best! So we get on the stand on [Cornejo]." (Block capitals omitted.) At the time he wrote the letter, Urbina was aware that the police had evidence linking him to the murder, and that Contreras had been talking to the authorities about the crime. Urbina apparently believed that it was no longer credible to deny involvement in the murder entirely: "[I]t's bad already con esta caso [with this case] so we better off telling them [Cornejo] did what he did." (Block capitals omitted.) He also appeared to believe that he might be able to escape some responsibility for the crime if he were not found responsible for pulling the trigger: "If anything me & [Cornejo] will fall but [Cornejo] charge for the murder. . . . My lawyer talked to the D.A. so what I did made me look good [although] it can backfire and get found guilty but I admitted of being there and witness so at [least] it shows me being honest and help them get this case right and <u>soon over with</u>." (Block capitals omitted.)

Urbina's purpose in writing the letter was to try "to fasten guilt on [Cornejo] while keeping his own skirts as clean as possible. The motivation was exculpatory but the

6

result was inculpatory." (*People v. Coble* (1976) 65 Cal.App.3d 187, 191, disapproved on another ground by *People v. Fuentes* (1998) 61 Cal.App.4th 956, 967-968.) Just as in *People v. Coble*, *supra*, where an accomplice tries to place blame on the defendant, the portions of the accomplice's statements that implicate the defendant are not admissible against the defendant, and the remainder of the statement is not relevant to his own guilt or innocence.[1] (65 Cal.App.3d at p. 192.) For this reason, the letter was not admissible against Cornejo as a declaration against penal interest under Evidence Code section 1230.

Reversal of Cornejo's conviction is required because it is reasonably probable that the jury would not have convicted Cornejo if the letter had not been admitted. (*See People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1373, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) The majority of the evidence in the case implicated Urbina. Apart from Urbina's letter, the evidence against Cornejo at trial was limited. Contreras testified against him, but she not only had obtained a favorable plea bargain in exchange for her testimony against Cornejo, but had also received threats from Urbina that he would physically harm her or implicate her brother in the crime if she did not tell the story in the way he preferred. The prosecution also introduced the recordings of two conversations Cornejo took part in while in jail. Although these conversations were suggestive of Cornejo's involvement in the murder, see part II, *post*, they were far from clear confessions of guilt. The jury was skeptical enough about the prosecution's case that it found untrue the allegation that Cornejo had personally fired the weapon. If the letter had not been introduced, it is reasonably probable that the jury would have acquitted Cornejo altogether.

II. *There Was Sufficient Corroborating Evidence To Support The Accomplice Testimony Against Cornejo.*

The vast majority of the evidence against Cornejo came from accomplices: The testimony of Contreras, and Urbina's letter. Under Penal Code section 1111, a defendant

---

[1]    We do not conclude on this basis that the letter was inadmissible against Urbina. The self-incriminating portions of the letter were certainly relevant as to Urbina.

may not be convicted of a crime solely on the basis of the testimony of an accomplice. Instead, such testimony must be "corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." (*Ibid.*) It is hornbook law that "one accomplice may not corroborate another." (*People v. Boyce* (1980) 110 Cal.App.3d 726, 737; accord *People v. Creegan* (1898) 121 Cal. 554, 557.)

We requested supplemental briefing on the subject of whether Urbina's letter itself was accomplice testimony against Cornejo, and if so, whether there was any corroboration of the accomplice testimony against him.[2] Although we have held that it was error to admit Urbina's letter against Cornejo, Part I, *ante*, the question of corroboration of accomplice testimony is not moot. If there was no corroboration of the accomplice testimony against Cornejo, we would be required to reverse his conviction for lack of legally sufficient evidence, with no possibility of retrial for reasons of double jeopardy. (*People v. Pedroza* (2014) 231 Cal.App.4th 635, 660.)

We conclude that sufficient evidence corroborated the accomplice testimony that we do not set aside Cornejo's conviction on this basis. To serve as corroboration, evidence must implicate the defendant personally: "[T]he corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (Pen. Code, § 1111.) Not every element of the offense must be corroborated. Indeed, evidence is sufficient even if it """"is slight and entitled, when standing by itself, to but little consideration.' [Citations.]""" (*People v. Williams*, *supra*, 16 Cal.4th at p. 681.)

The only non-accomplice evidence introduced at trial linking Cornejo to the crime came from recordings of two conversations involving Cornejo. The first took place when Liz Soto, the sister of Contreras and a Lott gang member, visited Cornejo in jail. Soto told Cornejo that the victim's cousin was angry at Cornejo and would be waiting for him to be released from jail. Cornejo replied that he was not concerned, but complained,

---

[2] Because a defendant's own statements may be used to corroborate accomplice testimony (*People v. Williams* (1997) 16 Cal.4th 635, 680), and because there was extensive other evidence against Urbina, it is clear that the evidence against Urbina was sufficient.

"How did they know?" Soto went on to tell Cornejo, apparently in reference to Contreras and Urbina, "you trust stupid people." Cornejo agreed, but decided that he would stand his ground, because the cousin was "not the only one that wants me dead."

The second recording introduced at trial was of a jailhouse phone conversation between Cornejo and Contreras. In this conversation, Contreras told Cornejo that he had been implicated in the killing of Ochoa. Cornejo replied, "how do they know this shit, though?" Later in the conversation, while still discussing the suspicion surrounding him, Cornejo repeated, "how the fuck . . . are they knowing these things . . . how the fuck are they saying these things."

Although both conversations were ambiguous at times, a reasonable jury could have concluded that Cornejo was concerned about both the authorities and fellow gang members who were close to the victim hearing that he was involved in Ochoa's murder, and that by saying, "How did they know?" Cornejo was acknowledging his involvement in the killing. This evidence was far from overwhelming, but it was sufficient "'without aid from the accomplice's testimony, [to] tend to connect the defendant with the offense.'" (*People v. Nelson* (2011) 51 Cal.4th 198, 218.) Consequently, it was sufficient to meet the low standard required for corroboration of accomplice testimony. (*People v. Williams*, *supra*, 16 Cal.4th at pp. 680-681.)

III. *Urbina's Conviction For First Degree Premeditated Murder As An Aider And Abettor Must Be Reversed Because It May Have Been Based On The Improper Theory Of Natural And Probable Consequences.*

While Urbina's appeal was pending, our high court decided *People v. Chiu*, holding that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine." (*People v. Chiu*, *supra*, 59 Cal.4th at pp. 158-159.)

Here the prosecutor argued, and the court instructed the jury, that Urbina could be convicted of first degree murder as an aider and abettor under the natural and probable consequences doctrine.

9

The jury may have convicted Urbina under the prohibited theory because there was evidence Urbina only intended that Ochoa receive a beating, not that he be killed. Contreras testified that while they were driving around looking for Ochoa, Urbina said Ochoa needed to "get checked" which she understood to mean Ochoa would "get[] his ass beat." The prosecution's gang expert, Detective Eduardo Aguirre, confirmed Contreras's understanding. He testified that to "check" someone meant to "put someone straight." In other words, "to keep them in line, make notice of something that . . . the gang didn't care that they did." In a letter to Contreras from jail, Urbina stated, "I just wanted to kick his ass" and "I wanted to fuck him up." (Block capitals omitted.)

The prosecutor argued to the jury that "there's this area of the law called natural and probable consequences. . . . What that means is even if defendant Urbina thought he was going up to do an assault, but he has an understanding, a reasonable understanding, that there could be a murder that could happen." The court instructed the jury that it could find Urbina guilty of murder as an aider and abettor on the theory that "under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of assault with a deadly weapon or force likely to produce great bodily injury."

When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find beyond a reasonable doubt that the jury based its verdict on the legally valid theory. (*People v. Chiu*, *supra*, 59 Cal.4th at p. 167.)

Under the circumstances of this case we cannot conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that Urbina directly aided and abetted the premeditated murder of Ochoa rather than on the invalid theory that he was guilty of first degree murder under the doctrine of natural and probable consequences.

10

IV. *The Trial Court Did Not Err In Its Admission Of Lay Or Expert Opinion Testimony Against Urbina, Nor Did Urbina Receive Ineffective Assistance Of Counsel At Trial.*

Urbina argues that the trial court erred by admitting improper opinion testimony by Contreras and Gray. In particular, Urbina contends that Contreras should not have been permitted to testify that Urbina mentioned a woman named Brenda to her, and that she had been killed in retaliation for testifying against a member of the Lott gang. Urbina claims that this evidence was irrelevant, outside the scope of Contreras's personal knowledge, and substantially more prejudicial than probative. (See Evid. Code, § 352.) We disagree. Although courts have held that "evidence that a defendant is threatening witnesses implies a consciousness of guilt and thus is highly prejudicial and admissible only if adequately substantiated," (*People v. Warren* (1988) 45 Cal.3d 471, 481), there was ample substantiation here. Urbina wrote several letters to Contreras containing express or implied threats, including one introduced into evidence in which he wrote, "I'll really fuck you over and make sure you have it bad! Try me!" (Block capitals omitted.) In an earlier letter, Urbina was even more explicit, writing, "I will make sure you don[']t go home and the chikito won[']t be to[o] happy so do you remember when I told you don[']t play with fire? Well don[']t let me burn you." (Block capitals omitted.)

Urbina also argues that it was error to allow Gray to testify, without proper foundation, that in his opinion, Ochoa's murder had been authorized by the "shot callers" in the gang. Finally, Urbina objects to Gray's testimony that "word on the street" was that a gang member known as Lacras was not involved in the shooting, on the grounds that this was improper hearsay. Urbina failed to raise an objection at trial on either ground, and as a result, these issues are forfeited. (*People v. Morris* (1991) 53 Cal.3d 152, 187-188, disapproved on other grounds by *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) Had Urbina objected, the trial court at most would have required the prosecutor to establish a foundation for expert opinion testimony from Gray under Evidence Code section 801. There was no hearsay error regarding "word on the street" because the testimony was not offered to prove the truth of the matter asserted

11

(Evid. Code, § 1200), but rather to explain Gray's actions.  Because there was no deficient performance by trial counsel that prejudiced Urbina on these issues, Urbina's claim of ineffective assistance of counsel also fails.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

## DISPOSITION

The judgment as to defendant Cornejo is reversed.  Because the reversal of Cornejo's conviction is based on the erroneous admission of evidence, rather than legal sufficiency of the evidence against him, the principles of double jeopardy do not bar the People from retrying him.  (See *People v. Cooper* (2007) 149 Cal.App.4th 500, 522.)  His petition for habeas corpus relief is denied as moot.  The judgment as to defendant Urbina is reversed and the matter is remanded for the People to decide whether to accept reduction of the conviction to second degree murder or to retry Urbina for first degree murder on a theory other than natural and probable consequences.

NOT TO BE PUBLISHED.


ROTHSCHILD, P. J.

We concur:



CHANEY, J.



LUI, J.

12