Filed 4/12/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>AARON COOPER,<br><br>        Defendant and Appellant. | A161632<br><br>(Alameda County<br>Super. Ct. No. 125227A) |

In 2004, a jury convicted defendant Aaron Cooper of first degree murder and kidnapping based on his participation with two other men, Fredrick Cross and Miltonous Kingdom, in the 1995 killing of William Highsmith. The jury also found true that a principal was armed with a firearm during both offenses, but it acquitted Cooper of the charge of being a felon in possession of a firearm. After Cooper admitted various prior convictions, he was sentenced to 58 years to life in prison. This division affirmed the judgment in 2007. (*People v. Cooper* (2007) 149 Cal.App.4th 500 (*Cooper I*).)

Over a decade later, in January 2019, Cooper filed a petition for relief under Penal Code[1] section 1170.95. That statute was enacted as part of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which altered liability for murder under the theories of felony murder and natural and probable consequences. Under section 1170.95, eligible defendants may

---

[1] All further statutory references are to the Penal Code.

1

petition to have their murder convictions vacated and be resentenced.[2]  In the petition, Cooper alleged he was convicted of felony murder and could no longer be convicted of murder under amended section 189.

After appointing counsel for Cooper and considering the parties' briefing, the trial court found he had made a prima facie showing of entitlement to relief and issued an order to show cause.  The parties did not submit any "new or additional evidence" as authorized under section 1170.95, subdivision (d)(3).  Instead, relying primarily on *Cooper I* and the trial transcripts, the court found beyond a reasonable doubt that Cooper was "a major participant" in the underlying kidnapping and acted "with reckless indifference to human life" under amended section 189, subdivision (e)(3), precluding relief under section 1170.95.  The court came to this conclusion based in part on its belief that Cooper possessed and fired a gun.

On appeal, Cooper claims that it was improper for the trial court to rely at all on such a belief given his acquittal of the firearm-possession offense.  We agree.[3]  We hold that a trial court cannot deny relief in a section 1170.95 proceeding based on findings that are inconsistent with a previous acquittal when no evidence other than that introduced at trial is presented.  Thus, we reverse the order denying the petition and remand for the court to hold a new hearing to consider whether the prosecution proved beyond a reasonable

---

[2] Section 1170.95 was recently amended by Senate Bill No. 775 (2020–2021 Reg. Sess.) (Senate Bill 775), which went into effect on January 1, 2022.  Although the statute has changed in several significant respects, and we mention them as relevant, none changes the outcome of this appeal.

[3] As a result, we need not consider the claims that the trial court also erred in concluding Cooper necessarily acted with reckless indifference to life by being a major participant in the armed kidnapping and misapplying the standard of beyond a reasonable doubt.

doubt that Cooper was ineligible for relief under section 1170.95 for reasons other than having used or possessed a firearm.[4]

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

*A.*      *The Underlying Facts and Procedural History*

We begin with a brief overview of the proceedings culminating in the sentence Cooper is serving. Highsmith was killed in August 1995, and the following year Cooper and Cross were jointly tried. (*Cooper I*, *supra*, 149 Cal.App.4th at pp. 505–506.) A jury convicted Cooper of murder, kidnapping, and other crimes, and he was sentenced to 71 years to life in prison. (*Ibid.*) Several years later, after unsuccessfully appealing to this court, he obtained federal habeas relief on the basis that the admission of Kingdom's out-of-court statement violated the Confrontation Clause.[5] (*Id.* at pp. 506–507; *Cooper v. McGrath* (N.D.Cal. 2004) 314 F.Supp.2d 967, 985, 988.)

Cooper was retried in the fall of 2004. The jury convicted him of one count of first degree murder and one count of kidnapping and found true that

_____

[4] Cooper also filed a petition for writ of habeas corpus in which he claims that his trial counsel rendered ineffective assistance by failing to provide the trial court with certain evidence from his trial before it ruled on the section 1170.95 petition. By separate order in the habeas corpus matter, *In re Cooper* (No. A163780), we deny the habeas petition as moot. As discussed further below, Cooper may seek to introduce that evidence on remand.

[5] Cross also obtained relief based on the improper admission of Kingdom's statement, but by the time of Cooper's second trial Cross "was serving a life term for an unrelated murder." (*Cooper I*, *supra*, 149 Cal.App.4th at pp. 507, 514, fn. 14.) Kingdom was separately convicted of murder with a kidnapping special circumstance and sentenced to life without the possibility of parole. (*Id.* at p. 506, fn. 3.)

3

a principal was armed with a firearm during both offenses.[6]  But Cooper—who was stipulated to be a convicted felon—was acquitted of a charge of being a felon in possession of a firearm.[7]  (*Cooper I, supra*, 149 Cal.App.4th at p. 505, fn. 2.)  He then admitted to four prior convictions, one of which was for a serious felony and for which he served a prior prison term, and another for which he also served a prior prison term.[8]  (*Ibid.*)

In December 2004, the trial court sentenced Cooper to a total term of 58 years to life in prison, composed of a term of 25 years to life, doubled, for murder, plus one year for the arming enhancement, and consecutive terms of five years for the prior serious felony and one year each for the prior prison terms.  The upper term of nine years for kidnapping plus one year for the arming enhancement was imposed and stayed.  Cooper appealed and filed an accompanying petition for writ of habeas corpus, and in spring 2007 this division affirmed the judgment and denied the habeas petition.  (*Cooper I, supra*, 149 Cal.App.4th at pp. 505, 528, fn. 23.)

---

[6] Cooper was convicted under sections 187, subdivision (a) (murder), and 207, subdivision (a) (kidnapping).  The arming allegations were found true under section 12022, subdivision (a)(1).

[7] The felon-in-possession charge was brought under former section 12021, subdivision (a)(1).  (*Cooper I, supra*, 149 Cal.App.4th at p. 505, fn. 2.)  In 2012, section 12021 was recodified "without substantive change" at section 29800.  (*People v. Arevalo* (2016) 244 Cal.App.4th 836, 843, fn. 5 (*Arevalo*).)

[8] These two prior convictions were a 1989 conviction of robbery under section 211 and a 1993 conviction of being a felon in possession of a firearm under former section 12021.  (*Cooper I, supra*, 149 Cal.App.4th at pp. 505–506 & fn. 2.)  The 1989 conviction was found to be a serious felony and a strike under sections 667, subdivision (e)(1), and 1170.12, subdivision (c)(1), and Cooper admitted that he served prior prison terms for that conviction and the 1993 conviction under section 667.5, subdivision (b).  (*Cooper I*, at p. 505, fn. 2.)

There was strong evidence that Cooper participated in the kidnapping, but it was far less clear whether and to what extent he participated in the actual murder. The following facts, unless otherwise noted, are taken from *Cooper I*, *supra*, 149 Cal.App.4th at pp. 509–517 (footnotes omitted).[9]

"On August 16, 1995, the 'very decomposed' body of William Highsmith, known by the nickname 'Coco,' was discovered in a wooded area of the Oakland hills near Skyline Reservoir. The 'bottom part' of the victim's short-sleeve T-shirt had been torn away. A piece of cloth, apparently from the T-shirt, had been tied around his face and mouth so that it separated his teeth; a cloth gag had also been pushed into his mouth. The victim's jacket had been pulled down in the back and around his wrists to restrict the movement of his arms. His pants and boxer shorts had been pulled down to the level of his thighs. Scissors were found a few feet away from the body on the ground.

"An autopsy revealed that the victim had died from 'a gunshot wound to the head.' The bullet entered through the left cheekbone of the victim, passed through the skull, and lodged between the right side of the skull and the scalp behind the ear. The 'extensive fracturing of the skull' suggested a 'contact wound,' although no gunshot residue or splitting of the skin was detected. Due to the advanced state of decomposition of the body, a forensic pathologist offered the opinion that Highsmith had died 'very near the time that he was last seen alive,' nearly two weeks before on August 3, 1995, perhaps 'the same day.'

---

[9] Senate Bill 775 prevents a trial court from relying on facts recited in an appellate opinion to rule on a petition under section 1170.95, as the statute now provides that "the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law" and "the *procedural history* of the case recited in any prior appellate opinion." (§ 1170.95, subd. (d)(3), italics added; *People v. Clements* (2022) 75 Cal.App.5th 276, 292.) For purposes of this appeal, Cooper does not dispute that, with one exception we note below, *Cooper I* accurately recited the trial evidence. On remand, however, the trial court may not rely on the opinion's factual summary without Cooper's acquiescence.

"Witnesses had observed the abduction of Highsmith by three men at the intersection of 12th and Market Streets in Oakland on August 3, 1995. That morning, Zanetta Hodges talked with Highsmith, whom she had known most of her life, in the common area behind her residence in West Oakland. Highsmith told Hodges that he intended to 'beat up the person' who had accused him of stealing a car. Highsmith added that he 'was going to meet' with people 'at the store' to discuss the stolen car accusation.

"After speaking with Highsmith, Hodges went to East Oakland with her close friend Juanita 'Goodie' Walton to get a food stamp card. As they returned to the area of 12th and Market Streets on their way to pick up 'food stamps in West Oakland,' Walton saw 'people she knew' sitting in a blue Oldsmobile Delta 88 parked at the side of the Mingleton Temple church. At Walton's request, Hodges backed up her car and stopped across the street in front of Bottles Liquors to talk to the three men seated in the Oldsmobile: the driver Cross, the front seat passenger . . . Kingdom, and the rear seat passenger [Cooper]. Hodges was acquainted with [Cooper] and Cross, but had not met Kingdom before. Hodges testified that [Cooper] was wearing black leather gloves, and Walton noticed black gloves on all three of the occupants of the Oldsmobile. They were also wearing 'black hoody' jackets.

"Walton walked up to the Oldsmobile and asked the men inside, 'what were they doing out here' in West Oakland. [Cooper] said 'they were coming to look for someone who stole their drugs' and car, specifically Highsmith.[10] Hodges heard Cross say, referring to Highsmith, 'That [person] stole my car, Goodie.' When asked by [Cooper], 'what type of [person] was Coco,' Walton replied: 'That [person], Coco, he ain't stealing no

---

[10] In ruling on the section 1170.95 petition, the trial court agreed with Cooper that in her testimony Walton did not attribute this statement to him. Rather, Walton testified that one of the three men in the Oldsmobile said this, but she was not sure which. She did testify that Cooper said the men were "coming to talk to somebody about somebody stole something from someone that day."

car.  He the type of [person], he don't get his shoes dirty.  He don't steal cars.  He sells cars.'

"A red Corvette driven by K. K. Parker, with Highsmith in the passenger seat, then pulled up and parked on the street near the driveway of the church behind the Oldsmobile.  [Cooper] said, 'All right then,' and Walton was told to 'get away from the car.'  Walton returned to Hodges's car, whereupon Hodges drove away as the men in the Oldsmobile left that car and met in the parking lot by the church.  As she drove away, in the rear-view mirror Hodges observed [Cooper] touch Highsmith 'on the shoulder.'

"Rodney Love was also present at the scene of the abduction.  While Love was standing outside the Bottles Liquor store at 12th and Market Streets, a tall Black man about 20 years old—whom he neither knew nor identified—got out of a 'blue four door Delta,' approached him, and asked if he was 'Coco.'  Love saw a large revolver 'pokin' out' of the man's shirt.  Love said that he was not Coco, and the man walked back to the blue Oldsmobile, in which two other men were sitting.  The occupants of the Oldsmobile wore black 'puffy' jackets, and at least two of them wore gloves.  Love thought they all had guns.  According to Love, soon thereafter K. K. Parker drove up in a red Corvette, with Highsmith in the passenger seat, and parked behind the Oldsmobile.  Love unsuccessfully attempted to 'motion' to his friend Highsmith to warn him.  Parker and Highsmith got out of the Corvette and began talking to the men from the blue Oldsmobile, one of whom briefly grabbed Parker by the neck but then released him.  Parker ran into the liquor store.  After Highsmith admitted to the men that he was 'Coco,' they 'pull[ed] the guns out,' five or six shots were fired, and they forcibly pushed the victim into the trunk of the blue Oldsmobile.  One of the three men from the Oldsmobile got into the red Corvette, then both the Oldsmobile and the Corvette were driven off in the same direction.

"An employee at Bottles Liquor store, Musa Hussein, testified that at about 4:00 p.m. on August 3, 1995, he saw Highsmith outside the store engaged in an argument or heated conversation with three other men across the street by the church.  Highsmith was a regular customer of the liquor store,

7

but the other three men were not known to Hussein and he could not identify them, although he gave descriptions of them to the police. Hussein also noticed two vehicles, an 'old American' car and a red Corvette, parked near the men. According to Hussein's statement given to the police immediately after the kidnapping, which was read to the jury, one of the men arguing with Highsmith 'had a long gun.' Another man opened the trunk of the vehicle, while a third man grabbed Highsmith. Hussein then ran back into the store to call the police, but heard 'gunshots' outside. Customers yelled, '[T]hey're putting him in the trunk.'

"Douglas Wright, an investigator for the Alameda County District Attorney's Office, testified that at around 4:00 p.m. on August 3, 1995, he was driving on 12th Street, approaching Market, when he heard what he 'thought were two gunshots ahead' of him. He then observed a red Corvette parked on the right side of the road facing the same direction Wright was traveling. A man was standing behind the Corvette who was described by Wright as 'male Black, about 5' 11" in his mid-20's, 170 to 180 pounds.' Wright was unable to identify the man, but testified that he was 'consistent' in size and build with [Cooper]. As Wright drove by, the man quickly ran to the driver's side of the Corvette, jumped in, 'took off, squealed and accelerated around the corner.' Wright 'got a partial plate' on the Corvette, YOK953, but the last three numbers were incorrect. Across the street, Wright noticed people 'ducking down' behind a parked car as if they were 'trying to get out of the way. . . .'

. . .

"About 7:00 on the night of the abduction of Highsmith, George Archambeau was driving westbound across the San Mateo bridge toward Foster City when he observed a 'small, blue car' that was stopped with a red Corvette in front of it. As Archambeau passed the two cars, he noticed an African-American man standing outside the red Corvette, and another in the driver's seat. The man standing outside the Corvette threw an object that appeared to be a 'folded over' grocery bag over the bridge into the bay. Archambeau drove on, but the Corvette 'came driving by' him 'extremely fast' with two occupants in the vehicle, both African-American men. As the Corvette 'got caught

8

in the traffic' ahead, Archambeau 'wrote down the license plate,' 2YQK292, along with the notation 'red 'vette,' and contacted the highway patrol.

"Around 9:00 the same night, Moamer Mohamed was working at the Bottles Liquor store. As he was leaving the store he observed a red Corvette in front of the parking lot that blocked his exit. The engine of the Corvette was running and the window was open, but no one was inside. Mohamed saw an African-American man wearing a checkered shirt and dark gloves running away from the parking lot toward downtown Oakland. Mohamed moved the Corvette and called the police. The only identifiable fingerprints found on the red Corvette belonged to K. K. Parker or the victim.

"When Walton returned to her residence later that night with Hodges, Kingdom's blue Oldsmobile Cutlass was parked on the street in front of the house. She was frightened, and did not look in the car or immediately contact the police. The vehicle was located by the police, however, in front of Walton's house [on Voltaire Avenue] in East Oakland at about 10:00 that night.

. . .

"[Cooper] was arrested about an hour [later]. He was a passenger in a blue 1985 Oldsmobile Royale driven by Carl Anderson that was detained around 11:00 p.m. for expired registration tags. Anderson was taken into custody on a 'no-bail misdemeanor warrant,' and after [Cooper] was identified he was arrested in connection with the carjacking and kidnapping of Highsmith that afternoon. [Cooper] was wearing a green plaid shirt—like the one Mohamed had seen earlier that evening worn by the man who ran away from the red Corvette—and green pants; his 'hair was in corn rows.' Black leather gloves were found on the right front passenger seat which had been occupied by [Cooper], and a black leather jacket was left in the back-seat of the vehicle. Both of the gloves subsequently tested positive for gunshot residue, as did the left sleeve of the jacket. No blood was detected on the jacket or gloves. No gunshot residue was found on [Cooper's] hands.

9

"...Walton . . . identified [Cooper] as one of the men in the blue Oldsmobile at 12th and Market just before the abduction of Highsmith.  She subsequently identified photographs of Cross and Kingdom from a lineup as the other two men.

. . .

"At the scene of the kidnapping at 12th and Market, three spent shell casings were recovered:  two were brass nine-millimeter 'Lug[e]r caliber' casings fired from the same weapon, 'an S.W.D.-type firearm;' the other, apparently of older vintage, was a brass .45-caliber semiautomatic cartridge fired from another type of weapon.[11]  A criminalist also examined the bullet extracted from the victim's head, and determined that it was fired from one of two similar size firearm calibers:  a .40-caliber Smith and Wesson, or a 10-millimeter auto caliber.

"Warrants were issued for the arrest of Cross and Kingdom after they were identified by investigating officers as the other two men associated with the abduction of Highsmith.  The Oakland Police Department was notified on August 10, 1995, that Cross had been arrested in Mississippi.  Two taped statements were subsequently taken from him by investigating officers of the Oakland Police Department early the next morning.  Kingdom was arrested on November 6, 1995, in Mississippi.  Two days later when he was confronted with the statements made by Cross, [Kingdom] gave a statement to an Oakland police officer which was [later] found inadmissible. . . .

"Both taped statements made by Cross, and his testimony given at the first trial, were admitted in evidence and read to the jury at the second trial.  In his first statement Cross told the officers that he moved to California in 1992, and lived with his aunt on 55th Avenue in Oakland until a few months before his

---

[11] At trial, a crime scene technician testified that the .45-caliber semi-automatic cartridge was dented, "lying in some motor oil, and had some debris on it," in contrast to the two nine-millimeter shells, which were intact and clean.  The technician agreed that the .45-caliber cartridge appeared "like it had been out there a longer period of time" than the two nine-millimeter shells, suggesting it was not tied to the kidnapping.

10

arrest, when he stayed in motels in Oakland.  He stated that Kingdom is his cousin, and he met [Cooper] through one of his drug selling partners after he began living in Oakland.

"Cross reported that [four days] before the abduction of Highsmith [Cross's] 1988 'blue Iroc' Chevrolet, which contained cash . . . , clothing, and other valuables, was stolen in Emeryville while he was visiting a girlfriend.  He and a companion 'drove around' West Oakland looking for the car[, and] . . . [s]omeone else told Cross that 'Coco,' a man with two gold teeth who lived on Adeline and 'steals cars,' was . . . seen driving the Iroc around.  The next day, Cross and Kingdom drove through West Oakland in the blue Oldsmobile looking for the Iroc.  They heard that Coco was on 12th and Market, so they drove there.  When a man named 'Lon' said that he knew Coco, Cross gave him his pager number for Coco to call him.

"The following day between noon and 2:00 p.m., Cross heard from Coco, who denied that he stole the Iroc.  They agreed to meet at 12th and Market to discuss the matter further.  With Cross driving, he, Kingdom[,] and Cooper went to 12th and Market in the blue Oldsmobile.  Cross did not find Coco among the people on the street, then walked back to the Oldsmobile.  As he did, two men approached the car and one of them said, 'I'm Coco.'  After Coco said, 'I don't take cars,' Cross began to 'walk off.'  He returned to the Oldsmobile, and they drove away.  He took a flight to Memphis later that night.  Cross denied that they kidnapped Coco.

"In his second statement taken a few hours later, Cross admitted that when he, [Cooper,] and Kingdom arrived at 12th and Market in the blue Oldsmobile, they all had nine-millimeter handguns, although he denied that he owned any of the guns or had one in his immediate possession at the scene.  Cross said he was outside the car when Coco appeared with another man in a red Corvette.  While he and Coco were 'talking' on the sidewalk, 'everything jumped off.'  Suddenly, Kingdom and Cooper, with guns drawn, escorted Coco to the rear of the car and forced him into the trunk.  Someone fired shots, but Cross claimed it was not [him].

11

"Cross and Kingdom then got in the Oldsmobile, while [Cooper] jumped into the red Corvette. They drove both cars to East Oakland, around 109th and Foothill, where [Cooper] left the red Corvette and got back in the blue Oldsmobile with them. Coco was still in the trunk. They 'drove around' for a while, then returned to the E-Z 8 motel, where Cross was staying. Cross and Kingdom went into the motel room, but [Cooper] drove away with Coco. Cross claimed that Coco was alive in the trunk when he and Kingdom left the Oldsmobile for the hotel room. Cross was in the motel room for 40 minutes to an hour packing his clothes until [Cooper] returned in the car. Cross and Kingdom then joined [Cooper], and with Kingdom driving they returned to the location at 109th and Foothill where they previously parked the red Corvette. [Cooper] left the Oldsmobile and returned to the Corvette. [Cooper] drove off in the Corvette, and Cross did not see him thereafter. He and Kingdom drove the Oldsmobile to Voltaire and 100th, where they parked it. While Cross was in the Oldsmobile, he did not hear any noise or look inside the trunk.

. . .

"In his testimony at the first trial, Cross added details to his second statement and changed some of his account of the events. Cross testified that his blue Iroc was stolen on July 30, 1995. Taken with the car were its contents: $600 to $700 in cash, large amounts of marijuana and powder cocaine that were worth thousands of dollars if sold on the street, jewelry[,] and clothes. The drugs had been purchased the same day from [Cooper's] friend at 100th and MacArthur. Cross financed a small portion of the drug purchase, but [Cooper] contributed much more, between $2,000 and $4,000. Cross had intended to drive the Iroc to Greenville, Mississippi to visit his mother and sell the drugs. The theft of the car altered those plans. [Cooper] was 'upset' when he learned the car and drugs had been stolen. He accompanied Cross and Kingdom when they searched in West Oakland for the Iroc the day before the abduction of Highsmith. . . .

"Cross testified that he accepted Coco's word by telephone on August 3, 1995, that he 'didn't have' the car, but [Cooper] was insistent upon going to 12th and Market Streets to meet Coco.

12

[Cooper] said: 'Let's go out there,' so Cross agreed. Cross drove the blue Oldsmobile to 12th and Market Streets, Kingdom sat in the front seat, and [Cooper] was in the rear passenger seat. They parked across the street from the liquor store, near the church. Cross testified that he got out of the Oldsmobile to talk to people on the street in an effort to locate Coco, but left his gun on the front seat of the car. He claimed that he did not see or talk to Walton and Hodges. As he 'was walking toward the car,' a red Corvette driven by K. K. Parker drove up and parked behind the Oldsmobile. Parker went to the liquor store, and the other man in the Corvette walked up to Cross on the sidewalk and said, 'I'm Coco.' Coco said, 'I don't take cars,' and claimed he had not seen the Iroc. While holding a gun in one hand, [Cooper] then grabbed Coco from behind and backed him into the trunk of the Oldsmobile. Cross got in the front passenger seat of the car as [Cooper] told Kingdom to get the keys from the ignition and open the trunk. Cross 'heard shots' from behind the car, probably 'about six,' and ducked down. He did not know if Coco was shot, but thought it was 'a possibility.' The trunk was then shut and Kingdom ran to the front passenger side of the Oldsmobile. Cross 'scooted' into the driver's seat, took the keys from Kingdom, and drove away after Kingdom exclaimed, '[B]e out.' [Cooper] drove off in the red Corvette.

"When they reached 100th and Voltaire Streets, the red Corvette was abandoned. They drove in the Oldsmobile to the E-Z 8 motel, where Cross and Kingdom left the car. Cross went to his room to pack for his planned trip to Mississippi. [Cooper] returned to the motel and they all drove to 100th and MacArthur. Cross did not know if Highsmith was still in the trunk of the car. Cross exited the car there before [Cooper] and Kingdom 'drove off' without him. . . . Cross left the next morning for Mississippi, where he was arrested a few days later. He testified that he 'wasn't being truthful' entirely in his two statements to the police to 'cover' for [Cooper] and Kingdom."

B.    *Proceedings on the Section 1170.95 Petition*

In January 2019, Cooper filed his section 1170.95 petition. The trial court appointed counsel for Cooper, and the parties submitted briefing. The prosecution also submitted the *Cooper I* opinion, the jury's verdicts, the

13

minute order reflecting the verdicts, and the reporter's transcripts of the trial. At trial, Love's prior statement to police and Cross's police statements and testimony from Cooper's original trial were introduced into evidence but not transcribed, and none of this evidence was before the trial court when it ruled on the petition. (See *Cooper I, supra,* 149 Cal.App.4th at pp. 510, fn. 9, 514.) The court indicated it was "relying on the parties' briefs . . . [and] also the facts as set forth in [*Cooper I*]" for the content of Love's and Cross's prior statements.

Cooper was permitted to file a supplemental brief addressing the significance of his acquittal of the felon-in-possession charge. He argued that the fact the jury concluded he was unarmed weighed in his favor as to various factors relevant to whether he was a major participant in the kidnapping who acted with reckless indifference to human life, including his role in supplying or using lethal weapons and his role, if any, at the scene of the killing. The prosecutor responded that "[t]he only definitive conclusion" to be drawn from the acquittal was that the People were "unable to prove the charge beyond a reasonable doubt to all twelve jurors, not that [Cooper] was innocent or that the jury did not believe . . . Cross's testimony."

The trial court found Cooper had made a prima facie showing of entitlement to relief and issued an order to show cause. The parties agreed that the petition could be decided based on the briefing and materials already submitted, and additional evidence was not offered at the hearing to determine whether Cooper was entitled to relief.

At the hearing, the prosecutor repeated her position that an acquittal "doesn't mean that the person didn't do it, it means that [the jurors] couldn't find him guilty beyond a reasonable doubt." She also argued that the acquittal was "inconsistent" with the finding that Cooper was "guilty and

14

armed with the gun in the murder as well as the kidnapping." The prosecutor took the position that Cooper was the person seen throwing something off the San Mateo Bridge, which the trial court agreed *Cooper I* had stated.

Cooper's counsel responded that the acquittal should "be treated as a finding that [Cooper] did not have [a] gun." Counsel argued that it would thus be "improper" for the trial court to rely on "the premise of . . . Cooper being armed with a weapon" in deciding the petition. Counsel argued that in particular, although the prosecutor had repeatedly stated that Cooper was the one who threw a gun off the San Mateo Bridge, the acquittal established that "the jury did not so find."

The trial court then denied the petition, finding beyond a reasonable doubt that Cooper was a major participant in the kidnapping who acted with reckless indifference to human life.[12] In reaching this conclusion, the court made numerous statements to the effect that Cooper possessed and fired a gun on the day in question.

The trial court found that at the scene of the kidnapping "[a]t least two of [the three perpetrators] were armed and fired shots," which were not "randomly fired" but intended to "prevent anyone from stopping [the perpetrators] . . . and create confusion and stress among the witnesses so that

---

[12] Before Senate Bill 775 was enacted, Courts of Appeal were split on whether the prosecution's burden "to prove beyond a reasonable doubt, that the petitioner is ineligible for resentencing" under former section 1170.95, subdivision (d)(3), could be satisfied by substantial evidence that the petitioner was guilty of murder under the law as amended by Senate Bill 1437. (See *People v. Rivera* (2021) 62 Cal.App.5th 217, 229, fn. 8.) Here, the trial court applied the correct standard of proof under current law, which provides the prosecution has the burden "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by [Senate Bill 1437]." (§ 1170.95, subd. (d)(3).)

15

they would get away with this event."  Although acknowledging it was "not quite sure" of Cooper's role in planning the kidnapping, the court stated, "He played a significant role in it.  *He either fired a shot into the air, or two shots into the air, because two out of the three did.*"  (Italics added.)

Seemingly backtracking from finding that Cooper fired a gun at the scene of the kidnapping, the trial court then said that given "the speed at which the kidnapping occurred, it is unreasonable to infer that . . . [he] did not know that there were at least two guns present, and that the plan was to use them . . . to distract people and to get [the victim's] compliance.  So even if . . . Cooper did not personally use it, personally hold it, he necessarily knew that it was part of this plan."

But the trial court continued, "Further, *there is strong evidence in my mind that [Cooper] did fire a weapon*" at some point.  (Italics added.)  The court cited the fact that the gloves and jacket found in the car when Cooper was arrested had gunshot residue on them.  The court explained that this evidence "prov[ed] in [its] mind that the person who wore those gloves . . . and that jacket on August 3rd . . . fired a gun on that day before 11:00 . . . that night."  In turn, "[t]he only reasonable inference [to be made] from [Cooper's] sitting on those gloves at 11:00 p.m. on August 3rd is he had been wearing them earlier in the night," particularly because he was wearing gloves earlier that day when Highsmith was kidnapped.  Thus, the court determined, "the only reasonable conclusion to reach *is that [Cooper] fired a gun.  Whether it was at 12th and Market or off Skyline Boulevard, I don't*

16

know. That's a factor that leans towards the finding of a major participant."[13] (Italics added.)

The trial court also determined "that the most reasonable conclusion" was that Cooper was the person seen on the San Mateo Bridge "[getting] rid of a gun." The court noted the evidence that Cooper drove the red Corvette after the kidnapping and that he was the person wearing a checkered shirt seen running away from the car later that night. The court then observed that "the rational inference is that the person [who] seems to have had control over the Corvette throughout this event . . . most likely is the person that dumped it back at the liquor store at 9:00 [p.m.], was the person who had it at 7:00 [p.m.], when the only rational inference is somebody threw the firearms into the bay." Thus, it concluded, Cooper "tossed the gun or was on the San Mateo [B]ridge" when "the involved person [was] throwing off . . . the one or two firearms that were fired [at] 12th and Market, one of which . . . was used to murder . . . Highsmith on Skyline Boulevard."

## II.
### DISCUSSION

A. *General Legal Standards*

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.] In addition to substantively amending sections 188 and 189 . . . , Senate Bill 1437 added section 1170.95,

---

[13] The trial court indicated that it did not know whether Cooper "was present at the scene of the killing," but "at least two people were up on Skyline Boulevard[, and] . . . it's also quite possible all three were up there."

17

which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 959.)

It is uncontested that Cooper was convicted of felony murder, as the jury was instructed only on that theory. Murder "committed in the perpetration of, or attempt to perpetrate, . . . kidnapping . . . is murder of the first degree." (Former § 189, now § 189, subd. (a).) At the time of Highsmith's murder, "a defendant could be found guilty of felony murder under this statute as an aider and abettor so long as [the defendant] had 'the specific intent to commit the underlying felony' and, in furtherance of that intent, committed acts from which death resulted. [Citation.] In other words, an aider and abettor of the underlying felony was held ' "strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony." ' " (*In re Taylor* (2019) 34 Cal.App.5th 543, 550 (*Taylor*).)

As we explained in *Taylor*, "[u]ntil 1990, 'state law made only those felony-murder aiders and abettors who intended to kill eligible for a death sentence.' [Citation.] That year, the voters passed Proposition 115, which made eligible for death 'every person, not the actual killer, who, with reckless indifference to human life and as a major participant,' aids and abets a specified felony, including [kidnapping], that 'results in the death of some person . . . , and who is found guilty of murder in the first degree therefor, . . . if a[n enumerated] special circumstance . . . has been found to be true.' " (*Taylor, supra,* 34 Cal.App.5th at p. 550, quoting § 190.2, subd. (d) (§ 190.2(d)); see § 190.2, subd. (a)(17).) One such special circumstance is participation in a kidnapping murder. (§ 190.2, subd. (a)(17)(B).) "That a murder was committed during another felony under section 189, however, is

'insufficient of itself to establish a felony-murder special circumstance' under section 190.2(d). [Citation.] Rather, a defendant who . . . 'aided and abetted the underlying felony but was not the actual killer' and did not have an intent to kill 'must aid and abet the commission of the felony "with reckless indifference to human life and as a major participant" ' for the special circumstance to be imposed." (*Taylor*, at p. 551; § 190.2(d).)

Section 190.2(d) " 'was designed to codify the . . . holding [in] *Tison* [*v. Arizona* (1987) 481 U.S. 137], which articulates the constitutional limits on executing felony murderers who did not personally kill. *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782, collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions.' " (*Taylor*, *supra*, 34 Cal.App.5th at p. 551, quoting *People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*).) *Banks* and a follow-up decision, *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), "clarified 'what it means for an aiding and abetting defendant to be a "major participant" who acted with a "reckless indifference to human life." ' " (*Taylor*, at p. 546.) Based on the conclusion that section 190.2(d) " 'must be accorded the same meaning' as the principle discussed in *Tison* and *Enmund* and 'must be given the same interpretation irrespective of whether the defendant is subsequently sentenced to death or life imprisonment without parole,' " *Banks* and *Clark* described a number of factors to be considered in determining whether, under the totality of the circumstances, a defendant was a major participant in the underlying felony who acted with reckless indifference to human life. (*Taylor*, at pp. 551–553.) These include the defendant's "role . . . in supplying or using lethal weapons," "even if the defendant does not kill the victim or the

19

evidence does not establish which armed [perpetrator] killed the victim." (*Banks*, at p. 803; *Clark*, at p. 618.)

Senate Bill 1437 amended section 189 to provide that a defendant who was not the actual killer or did not have an intent to kill is not liable for felony murder unless the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3); *Taylor*, *supra*, 34 Cal.App.5th at p. 561.) Thus, amended section 189 uses the same standard for finding a special circumstance under section 190.2(d) to define when such a defendant is liable for felony murder. (*Taylor*, at p. 561.) In other words, only defendants who are also death eligible under section 190.2 may now be convicted of felony murder in the first place.

To pursue relief under section 1170.95, a petitioner "file[s] a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts." (§ 1170.95, subd. (a).) The petition must declare that the requirements for relief are met, including that "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subds. (a)(3), (b)(1)(A).) Upon filing "a facially sufficient petition," a petitioner is entitled to the appointment of counsel, and the parties then brief whether the petitioner has made a prima facie showing of entitlement to relief. (*People v. Lewis*, *supra*, 11 Cal.5th at p. 957; § 1170.95, subds. (b)(3), (c).) If the trial court concludes the petitioner has made the required prima facie showing, it must issue an order to show cause. (§ 1170.95, subd. (c).)

After an order to show cause issues, the trial court must "hold a hearing to determine whether to vacate the murder, attempted murder, or

manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170.95, subd. (d)(1).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. . . . A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1170.95, subd. (d)(3).)

> B.    *The Trial Court's Reliance on Its Belief that Cooper Possessed and Fired a Gun to Deny the Petition Requires Reversal.*

Cooper claims that his acquittal of the firearm-possession charge "collaterally estopped" the trial court from relying on "the idea that he both possessed and fired a gun" in ruling on the petition. (Italics and boldface omitted.) While we do not adopt Cooper's collateral-estoppel theory, we agree that any evidence he possessed or used a gun should not have played a role in the court's analysis.

Generally, in determining whether a trial court correctly denied a section 1170.95 petition after an evidentiary hearing, " ' "we review the factual findings for substantial evidence and the application of those facts to the statute de novo." ' " (*People v. Williams* (2020) 57 Cal.App.5th 652, 663.) The primary issue here is the preclusive effect of Cooper's acquittal of the

21

firearm-possession charge, an issue of law that we independently review. (See *People v. Arroyo* (2016) 62 Cal.4th 589, 593; *People v. Esmaili* (2013) 213 Cal.App.4th 1449, 1462.)

Cooper relies on the doctrine of collateral estoppel, or issue preclusion, which "precludes relitigation of issues argued and decided in prior proceedings." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341; *Ashe v. Swenson* (1970) 397 U.S. 436, 443.) When applicable in criminal cases, the doctrine "is a component of the double jeopardy clause of the Fifth Amendment" and article I, section 15, of the California Constitution, which both "provide that no person may be *tried* more than once for the same offense." (*People v. Santamaria* (1994) 8 Cal.4th 903, 912, fn. 3, italics added; *People v. Sanchez* (2020) 49 Cal.App.5th 961, 974–975.) Thus, in the criminal context, "[c]ollateral estoppel is traditionally applied to successive prosecutions, and there is some question whether [the doctrine] applies to further proceedings in the same litigation." (*People v. Gordon* (2009) 177 Cal.App.4th 1550, 1557.) Indeed, we have previously indicated that "double jeopardy principles are not at stake" in a section 1170.95 proceeding. (*People v. Myles* (2021) 69 Cal.App.5th 688, 704; accord *People v. Hernandez* (2021) 60 Cal.App.5th 94, 111; cf. *People v. Gonzalez* (2021) 65 Cal.App.5th 420, 433, review granted Aug. 18, 2021, S269792 [rejecting government's argument that collateral estoppel precluded defendant from relief under section 1170.95].) Thus, although the Attorney General does not raise the issue, it is not clear whether collateral estoppel principles apply in section 1170.95 proceedings.

We need not resolve this question here, however, because Cooper's claim is supported by established case law in the analogous context of petitions for resentencing under the Three Strikes Reform Act of 2012

(Proposition 36 or the Act).[14]  (See, e.g., *People v. Thomas* (2021) 64 Cal.App.5th 924, 941; *People v. Martinez* (2019) 31 Cal.App.5th 719, 725–727.)  Proposition 36 reduced "the punishment for some third strike offenses that are neither serious nor violent." (*Arevalo, supra,* 244 Cal.App.4th at p. 841.)  Similar to Senate Bill 1437, Proposition 36 also added section 1170.126, which "create[d] a procedure by which some inmates already serving third strike sentences [could] seek resentencing" to comport with the initiative's prospective ameliorative effect.  (*Arevalo,* at p. 841.)  *Arevalo* and a later case, *People v. Piper* (2018) 25 Cal.App.5th 1007 (*Piper*), both held that a trial court could not conclude that a defendant was ineligible for resentencing under section 1170.126 by relying on factual determinations about the defendant's gun use that "turn[ed] acquittals and not-true enhancement findings [at trial] into their opposites." (*Arevalo,* at p. 853; accord *Piper,* at p. 1015.)

In *Arevalo,* the defendant was convicted at trial of a third strike but acquitted of a charge of possession of a firearm by a felon, and an allegation that he was armed with a firearm was found not true. (*Arevalo, supra,* 244 Cal.App.4th at p. 841.)  When he petitioned for resentencing under Proposition 36, the trial court concluded he was categorically ineligible for relief because its review of the trial testimony convinced it that he "was armed with a firearm or deadly weapon" during the offenses for which he was currently serving a sentence.  (§§ 667, subd. (e)(2)(C)(iii), 1170.12, subd. (c)(2)(C)(iii), 1170.126, subd. (e)(2); *Arevalo,* at pp. 841–844 & fn. 6.)  The trial court believed it was not prevented from finding the defendant was armed, despite the acquittal and not-true finding at trial, because they did

---

[14] At our request, the parties submitted supplemental briefing on this issue.

not establish " 'the nonexistence of guilt, factual innocence, or incredulity of testimony given' " to support the charge and allegation.  (*Arevalo*, at p. 844.)

A key issue in *Arevalo* was which standard of proof applied to determining whether a defendant was ineligible for resentencing based on a factor (such as being armed during the offense) under section 1170.126, subdivision (e).[15]  (*Arevalo*, *supra*, 244 Cal.App.4th at p. 848.)  In holding that the appropriate standard was beyond a reasonable doubt, *Arevalo* relied on a Supreme Court case stating that " '[t]he parallel structure of the Act's amendments to the sentencing provisions and [the initiative's] resentencing provisions reflects an intent that sentences imposed on individuals with the same criminal history be the same, regardless of whether they are being sentenced or resentenced.' "  (*Id.* at p. 853, quoting *People v. Johnson* (2015) 61 Cal.4th 674, 686 (*Johnson*).)  *Arevalo* explained that if "a lesser standard of proof" applied, "nothing would prevent the trial court from disqualifying a defendant from resentencing eligibility consideration by completely revisiting an earlier trial, and turning acquittals and not-true enhancement findings into their opposites.  That is what happened here when the resentencing court relied on the disparity between [the] 'beyond a reasonable doubt' and 'preponderance of the evidence' standards to find [the defendant] ineligible for resentencing on the basis of an arming allegation that had been pled and disproved at his earlier trial.  To allow this result would violate *Johnson*'s 'equal outcomes' directive, leaving [the defendant] ineligible for resentencing

---

[15] Even if a person is otherwise eligible for resentencing under Proposition 36, a trial court has discretion to conclude "that resentencing the petitioner would pose an unreasonable risk of danger to public safety" (§ 1170.126, subd. (f)), a finding that may be based on facts proven by a preponderance of the evidence.  (*People v. Frierson* (2017) 4 Cal.5th 225, 239 (*Frierson*).)  This aspect of section 1170.126 is not relevant to our analysis.

while a newly convicted defendant with an identical criminal history would be found eligible for a second strike prison sentence." (*Arevalo*, at p. 853.)

The Supreme Court subsequently affirmed *Arevalo*'s holding that the standard of proof governing eligibility for relief under Proposition 36 is beyond a reasonable doubt. (*Frierson*, *supra*, 4 Cal.5th at p. 235.) In doing so, the Court rejected the People's argument that " '[i]mposing a beyond a reasonable doubt standard would in many cases make the prosecution unable to prove ineligibility even for those defendants who truly did have a disqualifying factor—merely because of the happenstance that the prosecution, having no need to prove such a factor years ago, made a less than complete record.' " (*Id.* at p. 238.) The Court explained, "[N]othing in the . . . Act's language suggests the electorate contemplated that a lower standard of proof should apply at resentencing to compensate for any potential evidentiary shortcoming at a trial predating the Act. . . . [T]he parallel structure of the Act [explained in *Johnson*] would suggest an opposite intent." (*Id.* at pp. 236, 238.)

The following year, *Piper* considered whether a trial court properly found beyond a reasonable doubt that a defendant was armed with a firearm during the offenses at issue and was therefore ineligible for resentencing, even though a jury had acquitted him of several firearm-related counts and found not true an arming allegation. (*Piper*, *supra*, 25 Cal.App.5th at p. 1010.) *Piper* concluded that "[u]nder *Frierson* and *Arevalo*, on a resentencing petition, the trial court may not make an eligibility determination contrary to the jury's verdict and findings. To do so would allow the People, contrary to the . . . Act, to 'compensate for any potential evidentiary shortcoming at a trial predating the Act.' (*Frierson*, *supra*, 4 Cal.5th at p. 238.) It also would allow a trial court, contrary to *Johnson*, to

'turn[] acquittals and not-true enhancement findings into their opposites.' "
(*Piper*, at p. 1015.)

The analysis of *Arevalo* and *Piper* applies here. Similar to Proposition 36, Senate Bill 1437 created a "parallel structure" (*Johnson*, *supra*, 61 Cal.4th at p. 686) between its amendments to existing law (sections 188 and 189 governing liability for murder) and its resentencing provisions (section 1170.95). In discerning a parallel structure, *Johnson* observed that "[b]oth the sentencing scheme and the resentencing scheme [under Proposition 36] provide for a second strike sentence if the current offense is not a serious or violent felony, and they set forth identical exceptions to the new sentencing rules." (*Johnson*, at p. 686.) Senate Bill 1437's parallel structure is even more explicit. Section 1170.95 provides that a petitioner is entitled to relief unless "the prosecution . . . prove[s], beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (d)(3); see § 1170.95, subd. (a)(3) [eligibility for relief requires that "petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019"].) In other words, unless the prosecution can prove beyond a reasonable doubt that the petitioner is guilty of murder or attempted murder under current law, the same standard governing conviction in the first instance, the petitioner's homicide conviction must be vacated. Thus, Senate Bill 1437 also "reflects an intent that sentences imposed on individuals with the same criminal history be the same, regardless of whether they are being sentenced or resentenced." (*Johnson*, at p. 686.)

*Arevalo* and *Piper* apply here even though Senate Bill 1437, unlike Proposition 36, explicitly contemplates that the prosecution may "offer new or additional evidence" to meet its burden to show that a petitioner is ineligible for relief. (§ 1170.95, subd. (d)(3).) We recognize that this difference means that one justification for *Piper*'s holding does not apply equally to section 1170.95 proceedings. This justification is that in Proposition 36 resentencing proceedings the trial court may not make an eligibility determination contrary to the jury's verdict and findings because it would permit the People "to 'compensate for any potential evidentiary shortcoming at a trial predating the Act.'" (*Piper*, *supra*, 25 Cal.App.5th at p. 1015.) This distinction between Proposition 36's and Senate Bill 1437's resentencing procedures does not affect our analysis in this case, however, because the prosecution did not introduce any new or additional evidence at the hearing, and the trial court's conclusion that Cooper was ineligible for relief was based on the same evidence the jury considered.

We therefore turn to whether Cooper is entitled to relief under the principles discussed in *Arevalo* and *Piper*. To begin with, we agree with the Attorney General that Cooper's acquittal of the gun-possession count did not, as a matter of law, prevent the trial court from determining that Cooper was a major participant in the underlying felony who acted with reckless indifference to human life. The court's belief that Cooper possessed and fired a gun supported, but did not mandate, its ultimate determination that he was statutorily ineligible for relief because he was a major participant who acted with reckless indifference. Indeed, we acknowledge the possibility that the court could again conclude that Cooper is ineligible for relief because, regardless of any personal possession or use of guns, his involvement in the

27

kidnapping as a whole establishes he was a major participant who acted with reckless indifference to human life.

But the lack of an inherent conflict between the acquittal and the trial court's eligibility determination does not distinguish this case from either *Arevalo* or *Piper*. In *Arevalo*, the defendant was acquitted of possessing a gun, and the trial court determined he was ineligible for Proposition 36 relief because he was armed with a deadly weapon during the offense. (*Arevalo*, *supra*, 244 Cal.App.4th at pp. 841–842; see §§ 667, subd. (e)(2)(C)(iii), 1170.12, subd. (c)(2)(C)(iii), 1170.126, subd. (e)(2).) Of course, one can be armed with a deadly weapon that is not a gun. Confronting the question more directly, *Piper* concluded that an acquittal of the arming enhancement at issue "d[id] not necessarily preclude a trial court from making an eligibility determination under [Proposition 36] that a defendant was armed." (*Piper*, *supra*, 25 Cal.App.5th at p. 1015.) In doing so, the Court of Appeal accepted the Attorney General's argument that the arming enhancement "require[d] both a facilitative nexus and a temporal nexus," whereas the arming basis for ineligibility under the Act "require[d] only a temporal nexus," and also recognized that one could be "found 'armed' under the doctrine of vicarious arming." (*Id.* at pp. 1015–1016 & fn. 4.) The overlap in *Arevalo* and *Piper* between the issue resolved by the acquittal and the issue resolved by the eligibility determination was *closer* than it is here, but likewise not perfect.

Thus, the question is whether, in light of the evidence and arguments at trial, Cooper's acquittal of the firearm-possession count "constituted [a] finding[] inconsistent with" the trial court's theory that he was a major participant in the kidnapping who acted with reckless indifference to human life. (*Piper*, *supra*, 25 Cal.App.5th at p. 1015; see *Arevalo*, *supra*, 244 Cal.App.4th at p. 848.) We have no difficulty concluding that it was. The

trial prosecutor argued that Cooper could be convicted of possessing a firearm based on the evidence that he had one "at 12th and Market during the kidnap" and that he was "on the bridge throwing things in the water. In any event, it's clear from this pattern of evidence, from the totality of this evidence, that throughout this event, Mr. Cooper was armed." The acquittal establishes that the jury rejected these arguments and was not convinced beyond a reasonable doubt that Cooper possessed a firearm, much less fired one. Yet the trial court, also applying the reasonable-doubt standard and considering the same evidence (less Cross's and Love's prior statements), found that Cooper *did* possess and fire a firearm, and explicitly relied on this finding to determine he was a major participant. Thus, in contravention of *Arevalo* and *Piper*, the court effectively turned Cooper's acquittal "into [its] opposite[]." (*Piper*, at p. 1015; *Arevalo*, at p. 853.)

The Attorney General makes two primary arguments for why reversal is unwarranted under the principles of *Arevalo* and *Piper*. The first appears to rely on a misunderstanding of the law and issues presented by this case. According to the Attorney General, by convicting Cooper of murder and kidnapping, "the jury necessarily concluded . . . that [Cooper] possessed the intents to kill and kidnap the victim as an aider and abettor." The Attorney General continues that even if the acquittal was inconsistent with "whether the jury found [Cooper's] acts showed malice aforethought," the trial court could still "consider[] . . . the evidence developed at trial in inferring [his] criminal intent and motive during the . . . murder" without contradicting the acquittal. But Cooper was convicted of *felony murder*, a theory under which malice is imputed based on participation in a lesser crime; an intent to kill or other form of actual malice is not required. Thus, Cooper's convictions do not establish anything about his intent to kill Highsmith. And the question

29

presented is whether the court's reliance on its belief that Cooper had and fired a gun to deny relief was inconsistent with the acquittal, not whether the court could rely on evidence of his intent more generally. In short, this argument misses the mark.

The Attorney General's second argument is that even if the trial court erred by relying on evidence that Cooper possessed a gun, "that error was harmless given other evidence showing [his] significant roles in the kidnapping and murder." Assuming, without deciding, that the applicable standard for assessing prejudice is that of *People v. Watson* (1956) 46 Cal.2d 818, 836, we conclude the error was prejudicial. Under *Banks* and *Clark*, a defendant's knowledge of the presence of weapons, personal possession of a weapon, and actual use of a weapon are all highly relevant to whether the defendant was a major participant who acted with reckless indifference to human life. (*Clark, supra*, 63 Cal.4th at p. 618; *Banks, supra*, 61 Cal.4th at p. 803.) While we agree with the Attorney General that the evidence Cooper had and fired a gun was not the *only* evidence supporting the court's eligibility determination, it was crucial to that determination. If, as the court believed, Cooper fired a gun at the scene of the kidnapping or the murder, that was strong evidence that he acted with reckless indifference to human life. And if, as the court suggested, he was the person who threw one or more firearms off the San Mateo Bridge, that was key evidence that he knew Highsmith had been murdered and tried to cover it up. We conclude that while not certain, it is reasonably probable that the court would not have denied Cooper relief had it not found that he possessed and fired a firearm. Accordingly, reversal is required.

Turning to the disposition, we conclude it is appropriate to remand the matter for a new hearing on whether Cooper is entitled to relief. As an

30

alternative to his other claims, Cooper argues that there was insufficient evidence that he was a major participant in the kidnapping who acted with reckless indifference to human life. If we accepted this argument, it would be appropriate to direct that Cooper's resentencing petition be granted, not to remand for further proceedings. Cooper devotes only a paragraph to this claim, however, and he fails to show that the evidence of his involvement in the crimes on which the court *could* properly rely was insufficient to demonstrate he was ineligible for relief based on the *Banks* and *Clark* factors.

On remand, the trial court shall hold a new hearing under section 1170.95, subdivision (d)(1), unless waived by the parties, at which Cooper shall have an opportunity to present the omitted trial evidence that is the subject of his current habeas petition—namely, the transcript of Cross's prior testimony. In conducting the hearing, the court shall apply the current version of section 1170.95, including the following provision: "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (§ 1170.95, subd. (d)(3).)

### III.
### DISPOSITION

The order denying Cooper's section 1170.95 petition is reversed. The matter is remanded for the trial court to hold a new hearing to determine whether the prosecution proved, beyond a reasonable doubt, that Cooper was a major participant in the kidnapping and acted with reckless indifference to human life. In doing so, the court shall not rely on any evidence admitted

31

during the trial that contradicts the jury's finding that the prosecution failed to prove beyond a reasonable doubt that Cooper possessed a firearm.

                                                             _____

                                                              Humes, P.J.

WE CONCUR:

_____

Margulies, J.

_____

East, J. *

*Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Cooper*  A161632

Trial Court:

Superior Court of the County of Alameda

Trial Judge:

Hon. James P. Cramer

Counsel for Defendant and Appellant:

Alex Coolman, under appointment by the Court of Appeal

Counsel for Plaintiff and Respondent:

Rob Bonta, Attorney General

Lance E. Winters, Chief Assistant Attorney General

Jeffrey M. Laurence, Senior Assistant Attorney General

Bruce L. Ortega, Deputy Attorney General

René A. Chacón, Supervising Deputy Attorney General

Bridget Billeter, Deputy Attorney General

*People v. Cooper*  A161632